**UNITED STATES of America**

v.

**George Gordon LIDDY, a/k/a George F. Leonard, Appellant.**

**No. 73–1565.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 14, 1974.

Decided Nov. 8, 1974.

---

Peter L. Maroulis, Poughkeepsie, N. Y., for appellant. Thomas A. Kennelly, Washington, D. C., also entered an appearance for appellant.

Sidney M. Glazer, Asst. Sp. Prosecutor, for appellee. Leon Jaworski, Sp. Prosecutor, Philip A. Lacovara, Counsel for the Sp. Prosecutor, Richard D. Weinberg and Robert L. Palmer, Asst. Counsel to the Sp. Prosecutor, were on the brief for appellee.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, LEVENTHAL, ROBINSON, MacKINNON and WIL-KEY, Circuit Judges, sitting en banc.

LEVENTHAL, Circuit Judge:

Appellant Liddy seeks reversal of his conviction on charges relating to the burglary and wiretapping of the offices of the Democratic National Committee in the Watergate apartment-office building complex in the early morning hours of Saturday, June 17, 1972. Appellant was named in six counts of an eight count indictment returned against seven defendants[1] on September 15, 1972. On January 8, 1973, jury selection began be-

---

1. The other defendants were James W. McCord, Jr., Everette Howard Hunt, Jr., Bernard L. Baker, Eugenio R. Martinez, Frank A. Sturgis and Virgilio R. Gonzalez.

fore then Chief Judge John J. Sirica of the United States District Court for the District of Columbia. Shortly after the trial commenced, five defendants changed their pleas to guilty.[2] On January 30, 1973, the remaining defendants, appellant Liddy and James W. McCord, Jr., were found guilty by the jury. Appellant was convicted of conspiracy in violation of 18 U.S.C. § 371 (count 1), burglary in violation of 22 D.C.Code § 1801(b) (counts 2 and 3), and unlawful endeavor to intercept oral and wire communications and interception of communications in violation of 18 U.S.C. § 2511(1)(a) (counts 4, 5, and 8). The sentences imposed by Judge Sirica on Liddy on March 23, 1973, are set forth in the margin.[3]

Appellant presents five grounds for reversal: (1) The trial judge erred in conducting *voir dire* by refusing to engage in individual questioning of each venireman who had been exposed to pretrial publicity. (2) The trial judge erred in reading to the jury the testimony of a government witness and related bench conferences taken outside of the jury's presence. (3) Instructions improperly allowed the jury to consider the time and circumstances under which appellant retained an attorney as bearing on his state of mind. (4) The trial judge erred in allowing testimony regarding defendant's statement that he lost his job for failure to cooperate with the FBI. (5) Appellant was denied his right to cross-examine a government witness by the trial judge's adherence to an order of this court prohibiting the introduction into evidence of the contents of illegally intercepted wire communications. We find no reversible error, and affirm.

## I. THE RECORD IN THE DISTRICT COURT

During a three-week jury trial the Government introduced extensive evidence concerning the activities of defendants Hunt, Liddy, and McCord regarding their efforts to secure political intelligence from the headquarters of various Democratic presidential candidates and the offices of the Democratic National Committee (DNC). The presentation focused on the period of May and June, 1972, during which the conspiracy was alleged to have been formed and the acts of burglary and violations of the wiretapping laws took place.

We summarize the evidence pertaining to the involvement of appellant Liddy. In late 1971 Liddy was hired by the Committee for the Reelection of the President (CRP) to serve as general counsel. Later, in January 1972, he agreed to organize an intelligence gathering operation to protect the campaign from violence and disruptions. In March, 1972, he moved from CRP down a flight of stairs to become counsel for the Finance Committee to Re-elect the President, although he continued his prior intelligence gathering assignment.

The Government presented several lines of evidence connecting Liddy with the five defendants apprehended in the DNC offices on June 17, 1972—McCord, and four residents of the Miami area, Barker, Martinez, Gonzalez, and Sturgis. First, there was the testimony of Hugh Sloan, treasurer of the finance committee. In April 1972, Sloan consulted Liddy regarding possible problems in accepting four checks drawn on a foreign (Mexican) bank, payable to and endorsed by one Manuel Ogarrio. The two agreed

---

**2.** Hunt pleaded guilty on January 11, 1973. Barker, Martinez, Sturgis and Gonzalez changed their pleas to guilty on January 15, 1973.

**3.** Count 1: Twenty months to five years, plus a $10,000 fine.

Counts 2 and 3: Five to fifteen years; each of these sentences to run concurrently with the other and with the sentence for count 1.

Counts 4, 5, and 8: Twenty months to five years, plus a $10,000 fine. The sentences under counts 4, 5, and 8 were to run concurrently with each other and consecutively with the sentence imposed under counts 1, 2 and 3.

The foregoing, combined, meant a sentence for all counts of not less than six years and eight months and not more than twenty years imprisonment, plus a fine of $40,000.

that the best way to handle these checks was to convert them into cash, and Liddy undertook to do this with the aid of friends around the country. The Government established that these Mexican checks, and also a check payable to and endorsed by a member of the finance committee totaling $114,000, were deposited in a Miami bank account by defendants Barker and Martinez on April 20, 1972, and that the bulk of the funds were withdrawn within two weeks by Barker. Liddy later returned $111,-500 in $100 bills to Sloan.

Sloan further testified that he turned over to Liddy a total of $199,000 in cash, primarily in $100 bills. Bills of that denomination were given by Liddy to McCord, who was in charge of security for CRP and the finance committee, and later were found, in sequence, on McCord and the four other defendants apprehended in the DNC offices on June 17. The hundred dollar bills found on those men and in their hotel rooms were traced to Barker's Miami bank account.

In addition to the use of the checks and the hundred dollar bills, the Government introduced telephone company and hotel records. The telephone slips showed calls from Liddy to Barker placed just prior to trips made by the four Miami residents to Washington in May and June, 1972. The guest records indicated that six of the defendants, using aliases, checked in together at a Washington hotel on May 22, 1972, and rented rooms together at the Watergate Hotel until May 29, 1972.

Thomas Gregory, a college student, gave evidence tying Liddy to Hunt and other defendants in connection with plans to enter the offices used by Senator McGovern in his campaign to secure the Democratic Presidential nomination. Gregory had been hired by Hunt in early 1972 to infiltrate Senator Muskie's headquarters and pass information to Hunt. In April, Hunt directed Gregory to switch to McGovern headquarters and continue his activities there. Gregory testified to meeting Liddy, along with Hunt, and driving around while Liddy questioned Gregory about the layout of the McGovern offices. They then proceeded to McGovern headquarters at approximately 2:00 a. m. where they found the back entrance locked and the front entrance too well lighted. Gregory met Liddy again on May 22, along with Hunt, McCord, Gonzalez, Sturgis, and two other men, at the hotel where six of the defendants had recently checked in. In Liddy's presence, Gonzalez, a locksmith, asked Gregory, McCord, and Hunt about the locks on the doors at the McGovern headquarters.

The operation for monitoring of the conversations on the intercepted DNC telephones was described by Alfred Baldwin, a former FBI agent who had been hired by McCord. McCord instructed Baldwin on the operation of the equipment he had assembled in room 419 of the Howard Johnson Motel located across the street from the DNC offices and requested that he monitor conversations which were political or personal in nature. McCord indicated that the unit was activated whenever the telephone of DNC's executive director, Spencer Oliver, was in use. In order to improve reception, the operation was moved to room 723 of the motel, which looked directly down into DNC headquarters. Through the first half of June, Baldwin estimated that he monitored 200 calls, including conversations of Oliver and his secretary Ida Mae Wells. He testified that on May 26, Hunt and Liddy came to room 419 and McCord then showed them the monitoring equipment. Later, Hunt, Liddy and McCord visited room 723 and used the balcony to survey the DNC offices.

*The Arrests and Subsequent Events*

When McCord, Barker, Martinez, Gonzalez, and Sturgis were apprehended in the DNC offices in the Watergate complex on June 17, at 2:00 a. m., they had in their possession walkie talkies, burglary tools, documents that had been taken from DNC files, telephone bugging devices, and equipment capable of transmitting voice conversations. Baldwin, who was acting as a lookout from the

balcony of room 723, saw two men emerge from an alleyway near the Watergate building shortly after uniformed policemen arrived at the scene. He identified one of the men as Hunt and testified that the other was wearing a suit he recognized as Liddy's. At about 3 a. m. Hunt arrived at room 723 with a walkie talkie and used the telephone to call an attorney, Michael Douglas Caddy.

Caddy's testimony established that about a half hour after this phone call, Hunt visited Caddy's apartment. Caddy then made a series of telephone calls to retain an attorney with more experience in criminal law. Caddy stated that at about 5 a. m. Hunt called Liddy from Caddy's apartment and informed Liddy that an attorney experienced in criminal law matters had been retained. Caddy talked to Liddy and confirmed what Hunt had said. Then Hunt gave Caddy $8500 in cash, one $500 bill and the rest in $100 bills.

At 8:30 a. m., Caddy went to arraignment court where he met Joseph Rafferty, a lawyer with experience in criminal law. They checked with the clerk to see whether the arraignment sheet contained names of five individuals, names that were the aliases then being used by the five men arrested in the Watergate. Shortly thereafter the attorneys went to a police station to confer with the five men. Caddy had met Barker a year previous but had never met any of the others. Caddy had not been contacted by any of these men prior to his appearance at the police station. After the meeting at the police station, Caddy called Hunt at home. A few days later, Liddy directed Caddy by telephone to pay to Mr. Rafferty $2500 of the $8500 he had received.

Later in the morning of Saturday, June 17, Liddy went to the Finance Committee for the Re-election of the President. Hugh Sloan testified that he ran into Liddy in the hall outside his office, at which time—"He was obviously in a hurry. He indicated to me at that point he couldn't stop; he said to the best of my recollection: my boys got caught last night; I made a mistake; I used somebody from here which I said I'd never do. I'm afraid I am going to lose my job." (Tr. 1452).

Later in the day, Liddy inquired about the Committee's largest shredding machine and was instructed in its operation. He was subsequently seen with a large stack of papers on the floor where the shredder was located. The Government introduced, as further evidence of Liddy's guilty knowledge, testimony of Hunt's employer, Robert Bennett, that on July 2 Liddy told him that he had lost his job at the Committee for failing to cooperate fully with the FBI.

The defense consisted primarily of an attack on the credibility of Gregory and Baldwin and challenges to their identifications of Liddy. Character witnesses and evidence that Liddy cooperated with the FBI in late July were presented. Liddy did not testify.

## II. VOIR DIRE EXAMINATION ON PRETRIAL PUBLICITY

The purpose of *voir dire* examination is to safeguard the right to jury trial which "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." [4] The requirement of impartiality demands that *voir dire* examination serve as a filter capable of screening out prospective jurors who are unable to lay aside any opinion as to guilt or innocence and render a verdict based on the evidence presented in court.[5] The trial judge, acting under

4. Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961); United States v. Peterson, 157 U.S.App.D.C. 219, 223–224, 483 F.2d 1222, 1226–1227, cert. denied, 414 U.S. 1007, 94 S.Ct. 367, 38 L.Ed.2d 244 (1973); United States v. Blount, 479 F.2d 650 (6th Cir. 1973); United States v. Lewin, 467 F.2d 1132 (7th Cir. 1972).

5. Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); Kreuter v. United States, 376 F.2d 654, 656–657 (10th Cir.) cert. denied, 390 U.S. 1015, 88 S.Ct. 1267, 20 L.Ed.2d 165 (1967); United States ex rel. Bloeth v. Denno, 313 F.2d 364, 372 (2d Cir.) (en banc), cert. denied, 372 U.S. 978, 83 S.Ct. 1112, 10 L.Ed.2d 143 (1963).

Rule 24(a), Fed.R.Crim.P., is accorded broad discretion to mold the manner and mode of *voir dire* examination, to fit the demands of the case at hand,[6] and provides no basis for reversal unless he abuses his discretion, and there is substantial prejudice to the accused.[7]

■■ In United States v. Bryant, this court endorsed the recommendation of the American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press § 3.4(a) (1968) as encapsulating the proper criteria for determining when individual *voir dire* examination regarding pretrial publicity is required.[8] This standard requires individual examination "[w]henever there is believed to be a significant possibility that individual talesmen will be ineligible to serve because of exposure to potentially prejudicial material." Whether such a "significant possibility" exists in a given case depends on such circumstances as the amount and pervasiveness of the publicity, its tone or quality, its proximity to the date of trial, and the nature of the particular case. The totality of the circumstances controls whether the likelihood of prejudice is too great to permit the jurors' avowals of impartiality to be accepted.[9] When such a likelihood exists, individual questioning is necessary to provide the trial judge with a basis for determining whether the juror will be able to lay aside any opinion as to

guilt or innocence and render a verdict based on the evidence adduced at trial.

Appellant contends that, in light of the extensive pretrial publicity regarding the Watergate incident, such a significant possibility existed with regard to each prospective juror who admitted some prior knowledge of the case. He relies primarily on the Ninth Circuit's decision in Silverthorne v. United States, *supra,* which reversed a conviction because the trial judge failed to inquire into what each talesman knew about the case in order to assess the impact of the massive pretrial publicity. In that case the quantity, focus, and, most importantly, the inflammatory tone of the publicity created a substantial possibility that the prospective jurors' impartiality might have been undermined.[10] All of the sixty-five veniremen in *Silverthorne* confessed knowledge of the case and thirty percent of those veniremen initially questioned had formed an opinion regarding the guilt or innocence of the accused. 400 F.2d at 639. The Ninth Circuit concluded that, "under the peculiar and difficult facts of this case" and "in such an atmosphere," the trial judge had abused his discretion by not employing individual questions to develop an objective basis for determining each juror's impartiality. 400 F.2d at 639–640. Like *Silverthorne,* the other cases which appellant relies upon to urge the inadequacy of general assurances of impartial-

---

6. *See* United States v. Robinson, 154 U.S.App. D.C. 265, 269, 475 F.2d 376, 380 (1973); United States v. Bryant, 153 U.S.App.D.C. 72, 75, 471 F.2d 1040, 1043 (1972), cert. denied, 409 U.S. 1112, 93 S.Ct. 923, 34 L.Ed.2d 693 (1973); United States v. Colabella, 448 F.2d 1299, 1303 (2d Cir. 1971), cert. denied, 405 U.S. 929, 92 S.Ct. 981, 30 L.Ed.2d 803 (1972); Tillman v. United States, 406 F.2d 930, 940 (5th Cir.), vacated on other grounds, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969).

7. *See Robinson* and *Bryant* decisions, *supra* note 6; Silverthorne v. United States, 400 F.2d 627, 639–640 (9th Cir. 1968).

8. *See* United States v. Bryant, *supra* note 6. Other circuits have recommended adherence to the standard contained in § 3.4(a). *See* United States v. Addonizio, 451 F.2d 49, 67 (3rd Cir.), cert. denied, 405 U.S. 936, 92 S.Ct.

949, 30 L.Ed.2d 812 (1972); United States v. Colabella, 448 F.2d 1299, 1303 & n. 5 (2d Cir. 1971), cert. denied, 405 U.S. 929, 92 S.Ct. 981, 30 L.Ed.2d 803 (1972); Patriarca v. United States, 402 F.2d 314, 318 (1st Cir. 1968), cert. denied, 393 U.S. 1022, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969); Silverthorne v. United States, *supra,* note 7.

9. *See* United States v. Tropiano, 418 F.2d 1069, 1079 (2d Cir. 1969), cert. denied, 397 U.S. 1021, 90 S.Ct. 1258, 25 L.Ed.2d 530 (1970); Silverthorne v. United States, 400 F.2d 627, 639–640 (9th Cir. 1968).

10. San Francisco newspapers were "saturated with more than 300 articles concerning Silverthorne and the alleged reasons for the closing of [his] bank" and extensive coverage of his affairs was provided by area television and radio stations. 400 F.2d at 631.

ity given by jurors in response to *en masse* questioning involved extreme circumstances created by pervasive, inflammatory publicity.[11]

In United States v. Bryant, *supra,* this court recently approved a *voir dire* examination procedure involving general questions addressed to the veniremen *en masse* supplemented by individual questioning of those prospective jurors who had formed an opinion as to guilt or innocence *or who* recalled details of the case. 153 U.S.App.D.C. at 76–77, 471 F.2d at 1044–1045. In *Bryant* only some of the jurors admitted to having prior knowledge of the case, no juror indicated an opinion as to guilt or innocence, and a few confessed recollection of details. This court concluded that the trial judge's *voir dire* examination was "generally in accord with" the ABA recommendation.[12] Moreover, this court recognized the countervailing pressure, also present in the instant case, to shorten

*voir dire* in order to reduce exposure of the veniremen, prior to empanelling and sequestration, to publicity generated by the commencement of the jury selection process.[13]

In the present case, the trial judge used *voir dire* examination procedures similar to those employed in *Bryant*—general questions addressed to the entire array, followed by individual questioning of those who responded affirmatively to any of the initial inquiries, and thus raised the possibility they might have formed an opinion on the case. Although the trial judge recognized that the Watergate matter had been publicized extensively,[14] he did not abuse his discretion in declining the defendants' request that all the veniremen who had heard anything about the case be examined individually.

The trial judge, after determining that virtually all of the veniremen had some

---

**11.** In addition to *Silverthorne,* appellant relies on Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); United States ex rel. Bloeth v. Denno, 313 F.2d 364 (2d Cir.) (en banc), cert. denied, 372 U.S. 978, 83 S.Ct. 1112, 10 L.Ed.2d 143 (1963), and Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Irvin v. Dowd involved a prosecution for one of six murders which the defendant was alleged to have committed. The murders and the confession of the defendant had received extensive publicity. The Court noted that a pattern of bitter prejudice was present throughout the community where the trial was conducted. 366 U.S. at 727, 81 S.Ct. 1639. Ninety percent of the jurors examined had formed some opinion as to defendant's guilt as had eight of the twelve empanelled jurors. *Id.*

United States ex rel. Bloeth v. Denno also concerned multiple murders in which news of a confession had been publicized. In that case, all of the potential jurors who had formed an opinion thought the defendant was guilty, fifteen of the sixteen jurors and alternates had heard of the case, and eight of the sixteen had formed an opinion regarding guilt. 313 F.2d at 367–369.

The trial in *Sheppard* was not only plagued by extensive and virulent pretrial publicity but also was tainted by the exposure of the jury to publicity during the trial and the disruptive presence of broadcast and print journalists during the proceedings. 384 U.S. at

354–355, 358, 86 S.Ct. 1507. In short, general assurances of impartiality appear suspect under circumstances in which "so many, so many times, admitted prejudice." Irvin v. Dowd, 366 U.S. 717, 728, 81 S.Ct. 1639, 1645 (1961).

**12.** 153 U.S.App.D.C. at 77, 471 F.2d at 1045. The Second Circuit in United States v. Tropiano, 418 F.2d 1069 (1969), cert. denied, 397 U.S. 1021, 90 S.Ct. 1258, 25 L.Ed.2d 530 (1970), found a trial court's refusal to engage in individual questioning after only two prospective jurors recalled newspaper accounts of the case in harmony with the ABA standard. The Seventh Circuit had also rejected the proposition that individual questioning on *voir dire* is necessary whenever there has been significant pretrial publicity. Margoles v. United States, 407 F.2d 727 (7th Cir.), cert. denied, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969). Indeed, the court expressed doubt that individual questioning afforded greater protection than mass examination. *Id.* 407 F.2d at 732.

**13.** *See* 153 U.S.App.D.C. at 76, 471 F.2d at 1044.

**14.** At one point the trial judge stated that he guessed that "everybody has heard or read something about this case." Tr. 107, Gov. App. 19. He later labeled "incredible" the fact that two veniremen claimed no prior knowledge of the case. Tr. 151, Gov.App. 45.

knowledge of the case,[15] did grant defendants' request to the limited extent of conducting individual questioning of eight members of the array who had acknowledged exposure to some publicity. This individual questioning indicated that most knew little about the case, few remembered even a single detail, and none had formed an opinion as to the guilt or innocence of the defendants.[16] The results of the individual examinations thus served to verify prior responses to *en masse* questioning which indicated that few veniremen had formed an opinion regarding guilt or innocence.[17] Under these circumstances, the trial judge acted within his broad discretion in abandoning individual questioning and continuing *voir dire* on an *en masse* basis. He complied with the ABA recommendation by examining individually all prospective jurors who indicated an opinion regarding guilt or innocence or who recalled details of the case, for only those veniremen, under the facts of this case, presented a significant possibility of ineligibility.

## III. TRIAL JUDGE'S READING OF SLOAN'S TESTIMONY TO THE JURY

Immediately after Hugh Sloan testified that he did not understand the significance of Liddy's hurried statement—"my boys got caught last night"—at the time that it was made, the trial judge excused the jurors and announced that the rest of Sloan's testimony would be heard out of their presence. Following the prosecutor's completion of direct examination, the trial judge propounded 42 additional questions. (Tr. 1460–65). After the jury returned, the prosecutor asked Mr. Sloan when Liddy's June 17

remark came to have meaning to him. Defense counsel objected, and the prosecutor stopped his examination. Defense counsel put no questions on cross-examination and Sloan was excused.

Upon reviewing the record, the trial judge concluded that the jurors should have the benefit of the testimony taken in their absence. Three days after Sloan had completed his testimony, the trial judge informed counsel of his intention to read to the jury the transcript of Sloan's testimony beginning four pages before the jury was excused, continuing through the examination conducted out of the jurors' presence, and concluding with the final questioning of Sloan and a related bench conference which took place after the jury had returned. Prior to presenting the material to the jury, the trial judge read the entire section to counsel, indicating that several of his comments were to be excluded and allowing counsel to state objections to the procedure. The Government said it preferred that the evidence be developed by having the jury hear it from Sloan directly. The trial judge responded: "No, Mr. Sloan might have a lapse of memory, I don't know. I would rather read it from the record."[18] The Government acquiesced. The trial judge advised both sides that he would permit Sloan to be recalled for further questioning or cross-examination.[19]

The Government also asked whether the judge intended to read the bench conferences. The judge indicated that he did not "think they [were] harmful to either side" and explained that "the jury ought to hear the testimony in sequence."[20] Appellant's counsel objected to the entire proposal on the grounds that it would cause the jurors to place

---

**15.** One portion of the record shows that all but two talesmen had heard of the case, Tr. 150–51, but a later portion indicates that nine of the ninety-seven then remaining veniremen had not read about the case. Tr. 247–49.

**16.** None of the eight was challenged for cause based on pretrial publicity, although one of those questioned individually was excused after stating that she would follow what the Government said. Tr. 152–92.

**17.** Prior to the individual questioning, eleven of the then 117 prospective jurors acknowledged having formed an opinion regarding guilt or innocence. Tr. 108–09.

**18.** Tr. 1692–1693; D.App. 361–362.

**19.** Tr. 1719, 1733; D.App. 388, 399.

**20.** Tr. 1716, D.App. 385.

undue emphasis on Sloan's testimony and would undermine his decision not to cross-examine Sloan. He did not object to the inclusion of the bench conferences, however, until after they had been presented to the jury.

After recalling the jurors, the trial judge explained his decision to read the aforementioned testimony and cautioned them not to draw any inferences regarding his views from the procedure.[21] Subsequently, after Sloan's testimony was read to the jury, appellant raised objection to the disclosure of the material presented in the bench conferences. The trial judge then instructed the jurors that questions of counsel and arguments at the bench do not constitute evidence.[22]

Appellant asserts three claims of error with regard to the trial judge's action in reading Sloan's testimony to the jury: (1) The procedure prejudiced the appellant by lending undue emphasis to Sloan's testimony. (2) The disclosure of the bench conferences exposed the jury to inadmissible material prejudicial to appellant. (3) The procedure deprived appellant of his right to confrontation and cross-examination.

■ The precepts of fair trial and judicial objectivity do not require a judge to be inert. The trial judge is properly governed by the interest of justice and truth, and is not compelled to act as if he were merely presiding at a sporting match. He is not a "mere moderator."[23] As Justice Frankfurter put it, "[f]ederal judges are not referees at prize-fights but functionaries of justice." Johnson v. United States, 333 U.S. 46, 54, 68 S.Ct. 391, 395, 92 L.Ed. 468 (1948) (dissenting in part). A federal trial judge has inherent authority not only to comment on the evidence adduced by counsel, but also—in appropriate instances—to call or recall and question witnesses.[24] He may do this when he believes the additional testimony will be helpful to the jurors in ascertaining the truth and discharging their fact-finding function.[25] What is required, however, are reins of restraint, that he not comport himself in such a way as to "tilt" or oversteer the jury or control their deliberations.[26]

■ Applying these general principles to this particular case, we conclude that, although certain problems are presented by the action of the trial judge in reading to the jury from the testimony first taken from Sloan outside the jury's presence, his overall course was neither an abuse of his judicial function nor a denial of fair trial.

In this case we do not have the situation that commonly leads to a claim of judicial excess, wherein the trial judge either creates an appearance of partiality by continued intervention on the side of one of the parties[27] or undermines the

**21.** Tr. 1725–26, D.App. 394–95.

**22.** Tr. 1759, D.App. 425.

**23.** Quercia v. United States, 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321 (1933); United States v. Barbour, 137 U.S.App.D.C. 116, 117, 420 F.2d 1319, 1320 (1969); Billeci v. United States, 87 U.S.App.D.C. 274, 282, 184 F.2d 394, 402 (1950).

**24.** See Quercia v. United States, supra; United States v. Burch, 471 F.2d 1314, 1317 (6th Cir. 1973); United States v. Wilson, 447 F.2d 1, 8 (9th Cir. 1971); United States v. Eustace, 423 F.2d 569, 571 (2d Cir. 1970); Estrella—Ortega v. United States, 423 F.2d 509, 510–511 (9th Cir. 1970); United States v. Barbour, supra, 137 U.S.App.D.C. at 118, 420 F.2d at 1321; United States v. Cassiagnol, 420 F.2d 868, 879 (4th Cir.), cert. denied, 397 U.S. 1044, 90 S.Ct. 1364, 25 L.Ed.2d 654 (1970); United States v. Klass, 166 F.2d 373, 376 (3d Cir. 1948); Annot. 67 A.L.R.2d 538, 550–551 (1959).

**25.** Quercia v. United States, supra; United States v. Barbour, supra, 137 U.S.App.D.C. at 117–118, 420 F.2d at 1320–1321; United States v. Tyminski, 418 F.2d 1060, 1062 (2d Cir. 1969), cert. denied, 397 U.S. 1075, 90 S.Ct. 1523, 25 L.Ed.2d 810 (1970); Billeci v. United States, supra.

**26.** See Quercia v. United States, supra, 289 U.S. at 470, 53 S.Ct. 698; United States v. Green, 139 U.S.App.D.C. 75, 81, 429 F.2d 754, 760 (1970); Bursten v. United States, 395 F.2d 976, 983 (5th Cir. 1968); Blumberg v. United States, 222 F.2d 496, 501 (5th Cir. 1955).

**27.** See United States v. Fernandez, 480 F.2d 726, 737–738 (2d Cir. 1973); United States v.

effective functioning of counsel through repeated interruption of the examination of witnesses.[28] Here there was no interjection by the trial judge until he excused the jury at a time when the prosecutor had almost completed his examination. And there was no questioning by defense counsel.

The decision of the trial judge to proceed outside the presence of the jury was announced when Sloan gave testimony that the judge found hard to credit. (Sloan said he had not appreciated at the time the significance of Liddy's "my boys got caught" statement.) The removal of the jury was a prelude to questioning by the trial judge. The prosecutor completed his direct examination, eliciting that when Sloan initially gave information to the FBI and the prosecutors he was concerned about his liability under the campaign financing law, but was informed that, although no promises could be made, "common sense" made charges against him unlikely. Then the trial judge put his questions to the witness.

■ The majority of the questions put by the trial judge to Sloan were a retraverse of subjects covered on direct— the mechanics of the "laundering" of the Mexican checks; the cash payments to Liddy; the relation between Sloan and the prosecutor. The trial judge went beyond the ground covered in the prosecutor's direct examination in one respect: The judge asked Sloan to testify why the cash payments were made to Liddy. While the prosecutor elicited from Sloan on direct that cash payments had been made to Liddy, he did not inquire as to the purpose of those payments. And so the record as it stood left the jury only with the testimony of a prior witness, Jeb Stuart Magruder, the deputy campaign director of CRP, that substantial sums had been paid to Liddy in cash for the intelligence gathering functions that Magruder had assigned to Liddy, and

that he, Magruder, had not known of the plans for wiretapping and burglary. This left the jury with the prosecutor's approach that Liddy was the mastermind of both the intercept plan and the unlawful entry to implement it. The judge acted well within his discretion in seeking information of the accuracy of this approach from a witness who was likely to have such information. Magruder's testimony did not foreclose further inquiry. There were gaps in the record even assuming Magruder had been accurate. (a) Magruder only purported to testify that on being consulted by Sloan concerning a large sum drawn by Liddy, he assumed the funds related to Liddy's indication that "he needed a considerable amount up front to get his intelligence-gathering operation into being" (Tr. 1415). (b) Magruder testified as to a "large sum" but not necessarily to all of the $199,000 Sloan paid out to Liddy. The questioning in some detail about the $199,000 in cash which Sloan had turned over to Liddy reflects the trial judge's evident skepticism that such a large sum would have been made available by Sloan without any explanation of the purpose for which it was to be used.

In response to the judge's questioning as to the purpose of the cash withdrawals by Liddy, Sloan could only say that he was not informed by Magruder, who gave the authorization, as to the purpose of the withdrawals. Magruder had established that the finance committee, although nominally a separate committee, had the function of making disbursements on the authorization of CRP. Sloan testified that he had verified Magruder's authority with former Secretary Stans, director of the finance committee, who in turn checked with former Attorney General Mitchell of CRP (Tr. 1443). Sloan also testified that eventually he made a full accounting to Stans of the cash he had disbursed (Tr. 1450). Although the judge's questions to Sloan went beyond Magruder's responses, the

---

Cassiagnol, *supra;* Pollard v. Fennell, 400 F.2d 421, 424, (4th Cir. 1968); Blunt v. United States, 100 U.S.App.D.C. 266, 276–277, 244 F.2d 355, 365–366 (1957).

**28.** See United States v. Cassiagnol, *supra;* Bursten v. United States, *supra;* Young v. United States, 120 U.S.App.D.C. 312, 314, 346 F.2d 793, 795 (1965).

testimony given by Sloan was congruent with that previously given by Magruder.

We cannot say that the trial judge abused his discretion either in the questioning of Sloan, or in submitting to the jury the information elicited in its absence.

■ Where a trial judge is concerned with a witness's reliability, he may insist on supplemental questioning—and the procedure for withdrawal of the jury in the first instance may serve to prevent irreparable prejudice to the trial. The judge is not confined by the fact that the questions he has in mind were not put by counsel.

■ The judge's latitude to insist on further questions to a witness must be judged prospectively. It is therefore not undercut by the fact that, with regard to Sloan, the supplemental questioning in court produced no evidence that significantly affected the testimony given on direct.

Liddy's contention of prejudice would have more force if it were predicated on questioning by the judge that had passed outside judicial discretion to an inquisitorial undertaking. While it is ironic that Judge Sirica, concerned as he was with perjury at the trial, did not question Magruder, whose perjury was later developed in the massive, historic inquiry by Congress, this development serves to underline that the judges's questioning of Sloan did not portray a wide-ranging probe of witnesses that transcended the judicial province. We are not here concerned with any indications the judge may have given before or after the trial as to the public need for a broader investigation. So far as the questioning of Sloan is concerned, this was apparently triggered by what seemed to be the im-

probability of his account as given. It may well be that all that was involved as to Sloan was naivete, and the willingness of an A.B. in history, not versed in law or economics, to follow the instructions of senior officials of the political committee, including a former cabinet member, and to make large disbursements of cash without further inquiry. But the matter must be judged prospectively; there was certainly basis for the trial judge's concern at the time that Sloan was holding back, and that supplemental questioning was needed to prevent pollution by perjury of the trial he was conducting.

■ Even though the supplemental questioning did not significantly affect the thrust of Sloan's direct testimony, the trial judge had discretion, on reviewing that testimony, to conclude that its presentation to the jury would help it discharge its responsibility. He might well have concluded that the evidence regarding Sloan's relationship with the prosecutors and the more detailed development of matters raised in previous testimony would better equip the jury to digest the substance of Sloan's testimony, to assess its bearing on Sloan's credibility, and to appraise the weight the evidence should be accorded.[29]

■ Separate problems are raised by the procedure used to present Sloan's testimony to the jury, as distinguished from the fact of its presentation. Sound and accepted doctrine teaches that the trial judge should avoid extensive questioning of the witness and should rely on counsel to develop testimony for the jury's consideration.[30] Here the trial judge not only failed to seek an alternative to personal intervention, he declined the prosecutor's request to elicit the additional testimony by further questioning of Sloan in the jury's presence.[31] A re-

---

**29.** See Tr. 1691, D.App. 360: "That testimony may have, it seems to me, an important bearing on Mr. Sloan's credibility before the jury and may have a bearing on other issues also before the jury."

**30.** *See* United States v. McClain, 142 U.S. App.D.C. 213, 216, 440 F.2d 241, 244 (1971);

United States v. Green, 139 U.S.App.D.C. 75, 81, 429 F.2d 754, 760 (1970); United States v. Paroutian, 299 F.2d 486, 491 (2d Cir. 1962); Blumberg v. United States, 222 F.2d 496, 501 (5th Cir. 1955).

**31.** Tr. 1693, D.App. 362. Past decisions have stressed that in general the trial judge would

opening of the record to enhance appraisal of credibility would ordinarily be furthered by presenting the witness, and his demeanor, if available. The problems are certainly not resolved by the trial judge's comment that Sloan "might have a lapse of memory, I don't know."

Nevertheless, we feel that the procedure did not infringe upon the requirement of fair trial. The impact of the extensive questioning by the trial judge was muted. He did not interrupt the direct examination with his inquiries. Reading a record already made tends to have less impact than question and answer by the witness. The judge's editing excised comments that might have been construed as an expression of an opinion regarding the credibility of the testimony given by Sloan.

The case would stand in a different posture if defense counsel had urged the trial judge to recall the witness for additional testimony. But here it was the prosecutor and not the defendant who asked that Sloan testify in person. Appellant's counsel clearly indicated that he did not want any further testimony from Sloan. In response to questioning at oral argument on appeal he stated:

> Oh, let there be no misunderstanding about that your Honor. I did not intend to have my position understood as being that I wanted Sloan brought back. I don't believe that, however, my choices should be that I should join with the prosecutor in either having the matter read back or having the

witness brought back. I don't think that covers the entire spectrum of choices. I think there is another choice, that it should be left alone.

 As to appellant's claim that the entire procedure was invalid because undue emphasis was accorded Sloan's testimony concerning Liddy's statement of June 17 that "my boys got caught last night," we are convinced by the Government's response that "no reasonable jury would have overlooked or forgotten such testimony." [32] Sloan's initial testimony about the June 17 remark given before the jury on direct examination and the Government's highlighting of the admission in summation and rebuttal rendered de minimis the effect of its inclusion at two points in the 22 pages of the record read to the jury. We also take note of the cautionary instruction given to the jury prior to the reading of the testimony. [33]

 Although prejudicial information contained in bench conferences may serve as grounds for reversal if the remarks are overheard by the jury,[34] the inclusion of two bench conferences in the portion of the record read to the jury also fails to support reversal in this case.

 Colloquy like that heard in bench conferences is often spoken in open court. An examination of this record and these conferences validates the trial judge's determination that the conferences were not harmful to either side.[35] Although the dry run of the trial

---

do better to forego direct questioning, and the possible impact on his objectivity, since he has available the alternative of suggesting to counsel the questions he believes ought to be pursued. United States v. Barbour, 137 U.S. App.D.C. 116, 119, n. 25, 420 F.2d 1319, 1322, n. 25 (1969); Jackson v. United States, 117 U.S.App.D.C. 325, 326, 329 F.2d 893, 894 (1964).

**32.** Appellee's Brief at 56.

**33.** *See* United States v. Harris, 441 F.2d 1333, 1335 (10th Cir. 1971); United States v. Barbour, 137 U.S.App.D.C. 116, 119 n. 27, 420 F.2d 1319, 1322 n. 27 (1969).

**34.** United States v. Green, 139 U.S.App.D.C. 75, 81–82, 429 F.2d 754, 760–761 (1970);

Young v. United States, 120 U.S.App.D.C. 312, 315, 346 F.2d 793, 796 (1965).

**35.** Of the two bench conferences read to the jury, only the second involves matters relevant to appellant's claim of error. Appellant's attorney objected to a question to Sloan as to when he first understood the meaning of Liddy's statement of June 17. Appellant's counsel expressed concern that the prosecutor was trying to establish "a connection between a newspaper article and the comment that was made by Mr. Liddy." Tr. 1751, D.App. 417. He also objected to questions regarding the witness's concern about possible violation of the Campaign Disclosure Act because of the implication that his client was involved in criminal activity. Counsel's remarks regard-

judge included the bench conferences before they were read and the Government specifically asked whether bench conferences would be read, defense counsel did not object to their inclusion. As soon as the point was raised, the trial judge instructed the jury that statements made during bench conferences are not evidence to be considered by the jury.[36]

 We turn to appellant's claim that the reading of Sloan's testimony deprived him of his right to cross-examination. The trial judge afforded appellant an opportunity to cross-examine Sloan and counsel steadfastly declined to exercise this right.[37] He urges that the right to cross-examine includes the right to refuse to cross-examine, and that this right was undercut by the trial judge's action. This is the kind of point that establishes resourcefulness of counsel, but not legal error. Although defense counsel may exercise his discretion regarding cross-examination, he has no absolute right to prevent further testimony by a witness.

 In sum, defense counsel has no right to preclude recall of a witness. A judge not only has power of recall, but latitude to use it to remove or dilute the pollution of a trial by testimony he believes to be perjurious or highly questionable. He may supplement the examination by counsel in order to draw out more information from a witness and to enhance the perspective for appraising his testimony.[38] The public interest in

safeguarding a record from taint is particularly keen when the case involves the integrity of the nation's political system—as can fairly be said when persons in the campaign of one major political party used clandestine contributions to penetrate the internal process of the other—and is consequently of moment in both the daily press and history. Judge Sirica's palpable search for truth in such a trial was not only permissible, it was in the highest tradition of his office as a federal judge. And although his execution of this objective presented problems, as must be acknowledged, they were not of a kind that deprived defendants of a fair trial. "A defendant is entitled to a fair trial but not a perfect one." Lutwak v. United States, 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593 (1953). The vitality of this precept is attested by e. g., Brown v. United States, 411 U.S. 223, 231, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); Bruton v. United States, 391 U.S. 123, 135, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Assuming for discussion that the problems already noted reflect error by the trial judge, it must be ranked as harmless rather than prejudicial error.

## IV. INSTRUCTION REGARDING RETAINING OF COUNSEL

On direct examination, attorney Michael Douglas Caddy testified as follows: At approximately 3:40 a. m. Saturday morning, June 17, 1972, Howard Hunt arrived at his apartment and arranged with him to secure counsel for the five men arrested in the Democratic National

ing Sloan's understanding of Liddy's June 17 statement neither acknowledged a connection between the newspaper article and the statement nor articulated that connection. Furthermore, any prejudice that conceivably may have occurred from questioning in this area took place prior to the reading of the bench conference when Judge Sirica read testimony by Sloan that upon examining the evening paper on June 17 he thought that there might be some involvement in the break-in. Tr. 1746–47, D.App. 412–13. Appellant's counsel failed to object to this testimony although he had at least two opportunities to do so. Counsel's statement referring to possible election law violations, although somewhat less obscure than this comment on the news-

paper article, also appears innocuous. Here too the jury had previously heard without objection that Sloan feared possible liability under the campaign law but had been assured that there was no wrongdoing. Tr. 1740–41, D.App. 406–07.

36. *See* cases cited at note 33, *supra*.

37. Tr. 1719, 1733, 1754–55.

38. *See* United States v. Burch, 471 F.2d 1314, 1317 (6th Cir. 1973); United States v. Cassiagnol, 420 F.2d 868, 879, (4th Cir.) cert. denied, 397 U.S. 1044, 90 S.Ct. 1364, 25 L.Ed.2d 654 (1970); Jackson v. United States, 117 U.S.App.D.C. 325, 329 F.2d 893 (1964); *See also* cases cited at note 24, *supra*.

Committee's offices an hour and a half earlier. At about 4:45 a. m. Hunt called Liddy and both Hunt and Caddy explained to Liddy the steps that had been taken to retain an attorney for those men. During this conversation, Liddy indicated that he desired to have Caddy represent him in this matter.

 Appellant assigns as error the trial judge's instruction that the jury could draw no adverse inferences from the fact that Liddy retained counsel but could "consider the time and other surrounding circumstances at which Mr. Liddy retained Mr. Caddy with respect to the state of mind of Mr. Liddy only." [39] Appellant claims that allowing the jury to draw inferences of guilty knowledge from his efforts to obtain counsel imposes a penalty on the exercise of his Sixth Amendment rights.[40] Liddy cites the Government's emphasis in closing argument on the unusual hour at which he retained counsel as evidence of the prejudicial nature of the alleged error.[41]

Appellant bases his Sixth Amendment claim on Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). In that case the Court held that comment on the defendant's failure to testify was forbidden by the Fifth Amendment, because it was tantamount to a penalty for exercising a constitutional right. Id. at 614–615, 85 S.Ct. 1229. A number of courts, including this court, have extended the principle announced in Griffin to prohibit comment on the defendant's failure to make an exculpatory statement upon arrest.[42]

There is only scant law on the applicability of the penalty analysis employed in Griffin to the Sixth Amendment right to counsel. Some courts have found reversible error in circumstances in which the prosecutor has commented on the defendant's silence and request for counsel upon arrest.[43] Those cases, though containing language referring generally to the right to counsel, appear to be bottomed on considerations involving the rights of an accused facing police interrogation—a context in which the right to counsel is intimately bound up with the privilege against self-incrimination. They are thus of marginal value in ascertaining the applicability of Griffin to the Sixth Amendment claim raised in the present case.

In the present case, the trial judge instructed the jury that no adverse inferences could be drawn from the fact that appellant Liddy exercised his constitutional right to counsel. The trial judge, however, drew a distinction between the fact of hiring counsel and the time and circumstances under which an attorney was retained by the defendant.

 Although it is the latter action of the trial judge that is contested on this appeal, we may usefully begin our discussion by approval of his instruction prohibiting the drawing of an adverse inference from the mere fact of hiring

**39.** Tr. 1263.

**40.** Appellant's claim that the challenged testimony violated the attorney-client privilege is without merit. National Union Fire Ins. Co. v. Aetna ·Casualty & Sur. Co., 127 U.S.App. D.C. 364, 365 n. 4, 384 F.2d 316, 317 n. 4 (1967).

**41.** Tr. 2057, D.App. 472.

**42.** Gillison v. United States, 130 U.S.App.D.C. 215, 399 F.2d 586 (1968); United States v. Mullings, 364 F.2d 173, 174–175 (2d Cir. 1966); Ivey v. United States, 344 F.2d 770, 772–773 (5th Cir. 1965).

There is disagreement as to whether a defendant's silence at the time of arrest can be used to impeach his testimony at trial. Compare United States v. Hale, 498 F.2d 1038 (D.C. Cir. 1974); Johnson v. Patterson, 475 F.2d 1066 (10th Cir.), cert. denied, 414 U.S. 878, 94 S.Ct. 64, 38 L.Ed.2d 124 (1973) with United States v. Ramirez, 441 F.2d 950 (5th Cir.), cert. denied, 404 U.S. 869, 92 S.Ct. 91, 30 L.Ed.2d 113 (1971). This disagreement appears to be grounded primarily on diverse conclusions reached in attempts to harmonize the Supreme Court's decision in Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), and Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**43.** Baker v. United States, 357 F.2d 11, 13–14 (5th Cir. 1966); Fagundes v. United States, 340 F.2d 673, 677 (1st Cir. 1965).

an attorney, at least when the circumstances are such that admission of evidence of such a request provokes the possibility that it will be taken as self-incriminatory. This prohibition of adverse inference from the fact of hiring an attorney seems to us to be a fair corollary to the Supreme Court's opinion in *Griffin*. We should, perhaps, refer to our opinion in Jones v. United States, 111 U.S.App.D.C. 276, 296 F.2d 398 (en banc 1961), cert. denied, 370 U.S. 913, 82 S.Ct. 1260, 8 L.Ed.2d 406 (1962), although it was not cited by parties. Insofar as *Jones*, which rejects a Sixth Amendment claim, uses the broad principle that the expression of a desire to have a lawyer never impinges on the right to have one, we think it is superseded by the reasoning of *Griffin*.[44]

 The trial judge erred, however, in limiting the application of the principle of *Griffin* with a ruling that apparently considered that it is generally proper to take into account the time and circumstances of retaining an attorney, and to draw whatever inferences as seem appropriate. Such a distinction generally raises problems that hobble the right to seek counsel. To the extent that an inference of criminality is operative, it invites probing of the very process of selection of counsel—who, why, when and where—and pressing the defendant to come forward with evidence concerning this process. The mischief of the approach is underlined by it semantic subtleties, which opens the door to maneuver and misunderstanding. It would be a rare case indeed where the prosecutor could not point out that the incriminating feature of the employment of counsel—in the absence of explanation—rests not in the employment as such but in the time and circumstances surrounding that event, and inferences therefrom that reflect adversely on the defendant.[45]

The Third Circuit recently examined the application of *Griffin* to a Sixth Amendment contention in United States ex rel. Macon v. Yeager, 476 F.2d 613 (3rd Cir.), cert. denied, 414 U.S. 855, 94 S.Ct. 154, 38 L.Ed.2d 104 (1973). In that case the prosecutor in his summation to the jury commented upon the fact that the defendant called an attorney the morning after the alleged crime and argued that this action cast doubt on the defendant's claim that the shooting was an accident. *Id.* 476 F.2d at 614. Although the defendant neither objected to the comment nor requested an instruction, the court held that there was plain error that required a reversal of the conviction. The court read *Griffin* as an

---

**44.** There were special circumstances in *Jones* that prevented the "*Griffin* claim" from emerging brightly. The request for counsel was made by some one who had already been accused of crime, so that this was taken as a "natural remark" that did not "convey such implications [of guilt]." 296 F.2d at 402. Moreover, the accused testified that he had shot the deceased in the hospital, and he "blacked out." The court held that his virtually contemporaneous statements were admissible as showing that they were acts of a thinking person—"The prosecutor treated Jones's statement that he wanted a cigarette exactly as he treated the statement he wanted a lawyer." Judge Fahy's dissent, for four judges, put it, inter alia, that this statement was not competent evidence, and stressed that the prosecutor's use of this statement, along with a similar one made much later at police headquarters, constituted an "impingement upon the right to have counsel."

In view of the peculiarities of the fact situation in *Jones*, we see no point in speculating on the result that would and should have ensued if it had been decided after *Griffin*. Certainly, the broadside rejection of the Sixth Amendment contention was not sound.

**45.** In *Jones*, for example, a prosecutor faced with the instruction given in the present case might have argued that he raised the defendant's request to consult counsel because the time and the circumstances in which the request was made—almost immediately after the defendant had shot the decedent—indicated that the defendant had the requisite state of mind at the time of the shooting to support a conviction for first degree murder. Similarly, in United States ex rel. Macon v. Yeager, 476 F.2d 613 (3rd Cir.), cert. denied, 414 U.S. 855, 94 S.Ct. 154, 38 L.Ed.2d 104 (1973), the prosecutor could have claimed that the reference to the defendant's efforts to consult his attorney was made to show that the time at which that action was taken, shortly after the shooting and before arrest, cast doubt on the defendant's claim that the shooting was an accident.

absolute prohibition against the imposition of any penalty for the exercise of a constitutional right in a criminal law context. *Id.* at 615–616.

We agree with the Third Circuit's analysis that the admission of a request for counsel raises Sixth Amendment problems under *Griffin.* We are not called upon in this case to determine whether the Third Circuit was correct in treating *Griffin* as a bar that is absolute —whether, for example, it would apply where the request for or retainer of counsel was part of the actions constituting the offense, sometimes called the res gestae, so that omission of the request or retainer would distort the underlying account of the witnesses or undercut the likelihood that it would be considered reasonable or natural.

 In the present case, even if it be assumed that there was error in the admission of evidence, the prosecutor's summation, or the instruction, or all of these, the error would be "harmless beyond a reasonable doubt."[46] In *Macon,* where the Third Circuit found reversible error, the prosecutor's comment was directed at the credibility of the accused's story which was a central issue in the case. 476 F.2d at 616. Here, the time at which Liddy retained counsel was but one of a number of factors that linked him to Hunt and the five defendants apprehended a couple of hours earlier. Moreover, the effect of the error was mitigated by the fact that evidence of part of Liddy's 5:00 a. m. conversation with Caddy was clearly admissible to show Liddy's involvement in his action of retaining counsel for those arrested during the break-in. His assertion of a right to Sixth Amendment protection against any use of his statements to obtain counsel for himself certainly does not prohibit inquiry into portions of his conversation with Caddy relating to his action in obtaining counsel for others. This evidence of Liddy's efforts on behalf of the five defendants only a few hours after their arrest was probative of his involvement in their venture.[47]

The evidence against the appellant, summarized at the outset of the opinion, was so overwhelming that even if there were constitutional error in the comment of the prosecutor and the instruction of the trial judge there is no reasonable possibility that it contributed to the conviction.[48]

## V. ADMISSION OF STATEMENT REGARDING FAILURE TO COOPERATE WITH THE FBI

Appellant's fourth claim of error is also based on Griffin v. California.[49] He asserts that his Fifth Amendment privilege against self-incrimination was violated by testimony that Liddy had told Robert Bennett, Hunt's employer, that he was no longer with the re-election committee because he had failed to cooperate with the FBI. He argues that the use of that evidence by the prosecutor during summation constituted a comment on his silence in violation of *Griffin.*

 The Fifth Amendment prohibits any Government coercion that impairs an accused's right of silence, and *Griffin* reproves even the prospective coercion of prosecutorial comment at trial. But the right of silence is alloyed by

---

**46.** Chapman v. California, 386 U.S. 18, 23–24, 87 S.Ct. 824, 17 L.Ed.2d 705, reh. denied, 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241 (1967).

**47.** We are aware that this point, developed by Government's appellate counsel, differs from the trial prosecutor's use of the evidence— hammering away at the unusual hour. But it is properly taken into account in considering whether any error of the prosecutor at trial was harmless error.

**48.** Milton v. Wainwright, 407 U.S. 371, 372– 373, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972); Schneble v. Florida, 405 U.S. 427, 432, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); Harrington v. California, 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); Chapman v. California, *supra;* United States·v. Lee, 160 U.S.App.D.C. 118, 121–122, 489 F.2d 1242, 1245–1246 & n. 10 (1973).

**49.** 380 U.S. 609, 87 S.Ct. 824, 17 L.Ed.2d 705, reh. denied, 381 U.S. 957, 87 S.Ct. 1283, 18 L.Ed.2d 1283 (1965).

speech, even the speech that refers to the silence, at least where, as here, the statement is to a private party,[50] and is made freely and voluntarily without any hint of coercion.[51] The cases (footnotes 50 and 51) establish that in such circumstances Fifth Amendment values are not impaired. It was within the discretion of the trial judge to hold that the statement volunteered by appellant as an explanation for his action (of leaving the committee) was admissible to establish his consciousness of guilt.

## VI. PROHIBITION OF EXAMINATION ON CONTENTS OF ILLEGALLY INTERCEPTED WIRE COMMUNICATIONS

Prior to trial, persons claiming to be parties to intercepted conversations moved to suppress the contents of the illegally wiretapped conversations and to prevent their disclosure by witnesses at trial. After a series of rulings by the district court and this court and an *in camera* hearing on proposed testimony regarding the conversations, this court held that proof of the contents of the intercepted communications was not required to prove the charges against the defendants and ordered that the contents not be offered as evidence. The order allowed evidence regarding the identity of the telephones which were tapped and the persons at the Democratic National Committee who used those telephones. United States v. Liddy and Allen, No. 73–1020 (D.C. Cir. Jan. 19, 1973). Appellant contends that the foreclosure of questioning on the substance of the intercepted material violated his Sixth Amendment right to cross-examination.

■■■ The order prohibiting disclosure of the conversations restricted the range of proof available to both parties on the charge of actual interception of wire communications (count eight). As a result, the Government was limited to circumstantial evidence and to Baldwin's testimony that he overheard voices he recognized as those of Spencer Oliver and his secretary, Ida Mae Wells. Appellant was given ample opportunity to cross-examine Baldwin regarding the details of the wiretapping operation, his identifications of Liddy, and his ability to identify certain voices.[52] Although questioning regarding the contents of the conversations which Baldwin allegedly overheard might have provided an additional area in which to test his credibility, such an examination was not required to afford appellant a fair opportunity to test the truth of the direct testimony.[53] Under the circumstances of this case, the order prohibiting disclosure of the contents of the intercepted conversations vindicated the rights of the movants without undue interference with the rights of the accused.

Affirmed.

**50.** Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921), *cited with approval in* Couch v. United States, 409 U.S. 322, 331–332, 93 S.Ct. 611, 34 L.Ed.2d 548 n. 14 (1973).

**51.** Couch v. United States, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973); Murphy v. Waterfront Comm., 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964); Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

**52.** Appellant's counsel cross-examined Baldwin and Oliver but did not question Wells. Tr. 1164–1202, 1927–29.

**53.** *See* United States v. Rogers, 475 F.2d 821, 826–827 (7th Cir. 1973); Fountain v. United States, 384 F.2d 624, 628 (5th Cir.), cert. denied, 390 U.S. 1005, 88 S.Ct. 1246, 20 L.Ed.2d 105 (1968); United States v. Cardillo, 316 F.2d 606, 611 (2d Cir.), cert. denied, 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963).