**UNITED STATES of America**

**v.**

**Lulseged TESFA a/k/a H. Teffa.**

**Crim. No. 72–425.**

United States District Court,
E. D. Pennsylvania.

Sept. 30, 1975.

J. Clayton Undercofler, III, First Asst. U. S. Atty., Philadelphia, Pa., for United States.

Alan M. Lerner, Philadelphia, Pa., for Tesfa.

## OPINION

DITTER, District Judge.

The defendant was convicted of air piracy despite his contention that at the time of the offense he lacked the mental capacity to conform his conduct to the requirements of law. Defendant's motions for judgment of acquittal or a new trial were denied and sentence imposed. He has appealed, and I am filing this opinion in order to inform the Court of Appeals of my reasons for refusing his motions.

In support of his motions, defendant, Lulseged Tesfa, a native of Ethiopia, raised three contentions:

(1) he was denied due process because the court improperly found that he was competent to stand trial·

(2) the manner and form of the *voir dire* constituted an abuse of the trial court's discretion and denied defendant a fair trial before an impartial jury; and

(3) the court erred in finding an expert witness for the Government qualified to testify as to defendant's sanity, and in permitting him so to testify.

## I. FACTUAL BACKGROUND

The facts giving rise to this criminal prosecution are set forth at length in *United States v. Green*, 373 F.Supp. 149, 150–51 (E.D.Pa.), aff'd., 505 F.2d 731 (3d Cir. 1974). Suffice it to say for present purposes that defendant and another man, Michael Stanley Green, boarded National Airlines Flight 496 on July 12, 1972, in Philadelphia, and seized the airliner by force as it neared Kennedy Airport in New York City. After demanding $600,000. ransom, the two skyjackers ordered the crew to fly the airplane back to Philadelphia. Although the plane's captain escaped after landing, the rest of the crew, the passengers, and skyjackers remained inside the aircraft on a runway at Philadelphia International Airport until the early hours of July 13, when, using the remaining members of the crew as human shields, Tesfa and Green transferred to a second aircraft in which $500,000. and three parachutes had been placed. Thereafter, upon Tesfa's instructions the second airplane took off and headed south. As they approached the Gulf of Mexico, the skyjackers ordered the copilot, who was in command of the airplane, to fly to Jamaica. Seizing an opportunity when Tesfa momentarily left the cockpit, the copilot slammed the door shut and initiated maneuvers which alternately threw the skyjackers against the overhead and floor of the cabin. He ultimately set the airplane down on a small landing field in Texas, and together with the flight engineer escaped through a cockpit window. Four stewardesses remained inside the aircraft with Tesfa and Green until late on the afternoon of July 13 when the skyjackers surrendered to the F.B.I. Green was tried separately and convicted by a jury of air piracy. I denied his post-trial motions, and the Court of Appeals affirmed. See *United States v. Green,* supra.

## II. COMPETENCE OF THE DEFENDANT TO STAND TRIAL

Defendant's contention that this court improperly found him competent to stand trial—and consequently deprived him of due process—for convenience may be broken down into three sub-arguments. First, he asserts that he was not accorded a fully adversary hearing on the issue of his competency consonant with procedural due process. Second, he contends that I was biased and prejudiced, and conducted myself as "both presenter of evidence and trier of facts with respect to Defendant's competency." Finally, he argues that the evidence established that he was incompetent to stand trial and that my failure to make such a finding constituted a denial of substantive due process.

The defendant's competency was, from the outset, a primary concern of this court. Only two months after the skyjacking, and upon the motion of the Government,[1] I ordered that Tesfa be

---

1. 18 U.S.C. § 4244 provides:

Whenever after arrest and prior to the imition of sentence or prior to the expiration of any period of probation the United States Attorney has reasonable cause to believe that a person charged with an offense against the United States may be presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense, he shall file a motion for a judicial determination of such mental competency of the accused, setting forth the ground for such belief with the trial court in which proceedings are pending. Upon such a motion or upon a similar motion in behalf of the accused, or upon its own motion, the court shall cause the accused, whether or not previously admitted to bail, to be examined as to his mental condition by at least one qualified psychiatrist, who shall report to the court. For the purpose of the examination the court may order the accused committed for such reasonable period as the court may determine to a suitable hospital or other facility to be designated by the court. If the report of the psychiatrist indicates a state of present insanity or such mental incompetency in the accused, the court shall hold a hearing, upon due notice,

examined at the Medical Center for Federal Prisoners in Springfield, Missouri, where he was then confined, for the purpose of determining his mental competency to stand trial and to understand the proceedings against him. The result of that examination was a report of the Springfield Psychiatric Staff, dated October 31, 1972, and signed by Dr. Robert Jack Eardley, the Deputy Coordinator for Mental Health, in which he and three other physicians found that the defendant was not schizophrenic[2] but was malingering. The staff concluded he was competent, and on December 18, 1972, Dr. H. B. Fain, the Acting Chief of Psychiatric Services at Springfield, ordered that Tesfa be discharged from the medical center and returned to this court for trial.

On February 1–2, 1973, I conducted a hearing to determine the defendant's competency. Dr. Eardley testified that in his opinion, defendant was competent. Defense counsel produced four witnesses —Dr. J. Stephen Goldberg, a general practitioner and Chief Medical Officer at the Federal Reformatory at Petersburg, Virginia, to which Tesfa had been transferred from Springfield; Dr. John Hugh Wallace, a psychologist at the Petersburg facility; Dr. Robert J. Murney, a consultant at Springfield; and Dr. Robert L. Sadoff, a privately-retained psychiatrist practicing in the Philadelphia area—all of whom testified that defendant was incompetent to stand trial. At the conclusion of the hearing, and relying largely on the comparatively long period of time Dr. Eardley and the

other members of the psychiatric staff at Springfield had had to observe and examine the defendant, as contrasted with the much shorter times the other psychiatrists and psychologists had spent with him, I found him competent.

On May 14, 1973, on the basis of new information brought to my attention by the Government, another competency hearing was held. At that proceeding three expert witnesses unanimously agreed that defendant was not competent to stand trial. Dr. Arthur David Boxer, a psychiatrist on the staff of the Forensic and Psychiatric Unit at Holmesburg Prison, opined that Tesfa was schizophrenic. Albert Levitt, the chief psychologist for the Psychiatric Division for the Court of Common Pleas of Philadelphia County, stated that he believed that defendant was suffering not from schizophrenia, but rather from a dissociative reaction stemming from his incarceration. Dr. Francis Hoffman, a psychiatrist and the director of the Psychiatric Unit for the Philadelphia Common Pleas Court, concurred in Mr. Levitt's conclusion. Accordingly, on May 18, 1973, I adjudged the defendant to be incompetent to stand trial, and directed that he be sent back to the Springfield Medical Center.

Upon Tesfa's return to Springfield, Dr. Eardley assigned Dr. Emasue Snow, a staff psychiatrist, to be his treating physician. In December, 1973, the psychiatric staff issued a report signed by Dr. Snow diagnosing defendant's condition as social maladjustment and con-

---

at which evidence as to the mental condition of the accused may be submitted, including that of the reporting psychiatrist, and make a finding with respect thereto. No statement made by the accused in the course of any examination into his sanity or mental competency provided for by this section, whether the examination shall be with or without the consent of the accused, shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding. A finding by the judge that the accused is mentally competent to stand trial shall in no

way prejudice the accused in a plea of insanity as a defense to the crime charged; such finding shall not be introduced in evidence on that issue nor otherwise be brought to the notice of the jury.

2. In August, 1972, Dr. Robert J. Murney, who was at that time a consultant to the Springfield Medical Center, had concluded that the defendant was suffering from a schizophrenic condition and was, in his opinion, incompetent to stand trial.

cluding that he was competent to stand trial.

Prior to defendant's trial, another competency hearing commenced on October 15, 1974. Dr. Eardley, who had left Springfield the previous July to become the Regional Administrator for the North Central Region of the Bureau of Prisons, stated that as of the time he last saw Tesfa, he believed him to be competent to stand trial. Dr. Emasue Snow also testified that it was her opinion the defendant was competent. At the conclusion of Dr. Snow's testimony, I found that there was sufficient evidence to conclude that the defendant was competent as of May, 1974. Since more than five months had elapsed since then, however, I directed Dr. Eardley, pursuant to 18 U.S.C. § 4244, to re-examine the defendant for the purpose of determining his competency at the present time. Dr. Eardley requested that Dr. David Taub, a psychologist, also be directed to examine Tesfa, a request which I granted.

The following day, after Drs. Eardley and Taub had examined the defendant for approximately two hours, a new competency proceeding—to ascertain defendant's competency as of that date—began. Both men opined that Tesfa was competent to stand trial. Dr. Taub also stated that in his opinion, the pressure and tension of the trial would cause defendant's mental condition to deteriorate "no more than for any ordinary person." At this hearing I also directed certain questions to the defendant and asked his attorney's opinion as to Tesfa's competency. Counsel responded that he had experienced no difficulty over the last month or so in communicating with the defendant, explaining things to him, and obtaining information from him. At that

juncture, I commented upon the evidence presented and concluded that the defendant was "able to understand the proceedings against him rationally and factually . . . able to assist in his own defense and . . . competent to stand trial." [3]

On October 29, 1974, upon completion of the jury selection process, certain inappropriate behavior on the part of the defendant both in and out of court [4] prompted me to hold yet another inquiry on the issue of his competency to proceed. At this proceeding defendant called to the witness stand Dr. Gerald Cooke, the chief psychologist at Norristown State Hospital for the previous year and a half. Dr. Cooke had been privately retained by the defense as an expert consultant. He stated that he believed that defendant was suffering from a hysterical dissociative reaction, that his behavior was neither conscious nor voluntary, and that he was incompetent to stand trial.

Dr. Eardley, who had at the Court's direction returned to Philadelphia for the purpose of examining the defendant, testified that in his opinion Tesfa's behavior was both conscious and voluntary, and that he remained competent. On October 30, Lois Briggs, a consulting psychologist at Springfield who had first interviewed the defendant in August, 1973, and who had together with Dr. Eardley, examined him the previous day, fully concurred with Dr. Eardley's conclusions and voiced her disagreement with Dr. Cooke's findings.

The defense then called Mr. Levitt, a consultant of the Government, who, in the presence of defense counsel and Dr. Hoffman, had spoken with the defendant

---

3. My detailed findings (N.T. 120–22, Oct. 16, 1974), followed criteria suggested by Judge Huyett in *United States v. Horowitz*, 360 F.Supp. 772, 775 (E.D.Pa.1973).

4. In the courtroom, the defendant smiled broadly, appearing on the verge of laughter, at unseemly moments, stared at the ceiling, and failed to respond to comments from his

attorney. On the morning of October 23, 1974, he "fainted" at the Philadelphia Detention Center, where he was then being housed. Later that day he engaged in an altercation with United States marshals as they attempted to transport him to the courthouse.

for approximately one-half hour the day before. Mr. Levitt likened defendant's behavior to that of a child who did not want to go to school. He further stated that although it was difficult to obtain information from the defendant, he and Dr. Hoffman had done so, and that Tesfa had said nothing inappropriate. At the conclusion of the hearing, I found that the defendant remained competent to stand trial.

On November 22, 1974, the day after the jury returned a verdict of guilty, the court commenced a posttrial competency hearing. At the outset, I stated for the record certain observations regarding the defendant's behavior of which I had made notes throughout the course of the trial. I thereupon called to the witness stand, in succession, one of my law clerks and my courtroom deputy, who had, at my instruction recorded their observations of the defendant's conduct in the courtroom both when court was and was not in session. The three of us made ourselves available for questioning by both defense counsel and the assistant United States attorney.[5] Dr. Eardley, at my direction had returned to Philadelphia, had examined the defendant, and was present in the courtroom while these statements were made. I also brought to his attention five portions of the trial notes containing statements by defense counsel about his observations of and contacts with Tesfa. In addition, Dr. Eardley read affidavits prepared by two members of defendant's family which dealt with his behavior during trial and recesses. Finally, Dr. Eardley read counsel's post trial motion, which contained certain factual informa-

tion. Having considered his past contacts and observations of Tesfa, his post trial examination of Tesfa, and this other material, it was Dr. Eardley's opinion that Tesfa had been competent prior to trial, during trial, and as of that date. Defense counsel objected to my making any findings as to competency at that time, since he wished to present further evidence to me. Accordingly, I refrained from doing so.

At defense counsel's request and in order that Tesfa's parents could be present, sentence was imposed on December 2, 1974, despite the fact that the additional evidence on the issue of competency had not been offered. Prior to pronouncing sentence, I reviewed the record and concluded that Tesfa had been competent prior to trial, remained competent during trial, and was then competent (N.T. 5–8, Dec. 2, 1974). This finding, however, was made with the specific understanding that it would be set aside in the event that additional evidence persuaded me that my decision was incorrect. Although I did hear more testimony, I remained convinced of Tesfa's competency before, during, and after trial.

On December 3, and December 10, 1974, Dr. Cooke testified that after examining Tesfa for approximately fifty minutes on December 2, it was his belief that defendant was suffering from a hysterical dissociative reaction and was therefore incompetent. Dr. Robert Sadoff, who had testified for the defense both at the February, 1973, competency hearing and at trial, stated that he concurred in Dr. Cooke's conclusions.[6]

---

5. This situation is, therefore, plainly unlike that in *Starshock, Inc. v. Shusted,* 493 F.2d 1401 (3d Cir. 1974), rev'g. 370 F.Supp. 506 (D.N.J.). There the Court of Appeals, in an unpublished opinion, held that supplementation of the record before a district court by affidavits of the trial judge's law clerks constituted error where that fact was not disclosed to counsel for the losing party and the court handed down its opinion before counsel had an opportunity to see the affidavits or cross-examine the affiants.

6. At trial Dr. Sadoff had testified that he found the defendant to be suffering from paranoid schizophrenia. He acknowledged on cross-examination at the post-trial competency hearing that when he testified at trial he already was aware of the results of Dr. Cooke's examination and psychological testing of defendant. (N.T. 162–64, Dec. 3, 1974). He further stated that his change in diagnosis—from paranoid schizophrenia to hysterical dissociative reaction—really was insignificant. (Id. at 165–67).

No formal finding was made at the conclusion of the testimony on December 10, 1974, for two reasons. First, I anticipated that there would be additional testimony and evidence, and secondly, I wished to afford counsel the opportunity to file such memoranda as they felt might be persuasive. There were no more tests and no further testimony. Nothing I heard on December 3 or December 10, 1974, in any way caused me to alter the conclusion I reached on December 2, 1974: Tesfa was competent before trial, during trial, after trial, and at the date of sentencing. In making this finding I credit the testimony of the two physicians, Dr. Eardley and Dr. Snow, and the two psychologists, Dr. Taub and Miss Briggs, and reject the testimony of Drs. Cooke and Sadoff.

"It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope v. Missouri*, 420 U.S. 162, 171, 95 S.Ct. 896, 903, 43 L.Ed.2d 103 (1975); see *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966).[7] Indeed, this prohibition is "fundamental to an adversary system of justice [citation omitted]." *Drope v. Missouri*, supra, 420 U.S. at 171–72, 95 S.Ct. at 904. For federal cases the test of competence to stand trial has been formulated in terms of the sufficiency of the accused's present ability to consult with his attorney with a reasonable degree of rational understanding as well as a factual comprehension of the proceedings against him. *Id.; Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960); *United States v. Pogany*, 465 F.2d 72, 77 (3d Cir. 1972).

Although the defendant asserts he was denied due process insofar as my competency determination was concerned, it is difficult indeed to imagine what additional procedures or safeguards the defendant could have been afforded. Competency hearings were held before, during, and after trial. The observations of those who saw and spoke with him during this time were submitted for evaluation. The defense was given an opportunity to conduct further tests and to offer additional arguments.[8] In all respects I fully anticipated and satisfied the Chief Justice's admonition in *Drope*, supra, that even when a defendant is competent at the commencement of his trial, a judge must always be alert to circumstances suggesting a change which would render the accused unable to meet the standards of competence. 420 U.S. at 181, 95 S.Ct. at 908. From the record and the foregoing summary of the many determinations of Tesfa's competency, it is abundantly clear that at each and every proceeding he was accorded the procedural safeguards mandated by due process: the assistance of counsel, fair and adequate notice, the confrontation and cross-examination of witnesses, and a decision by a fair and impartial tribunal based upon the evidence and applicable rules of law.[9]

7. For the common law rationale of this prohibition see 4 Blackstone's Commentaries 24 (9th ed. 1783); *Youtsey v. United States*, 97 F. 937, 940–46 (6th Cir. 1899). One modern approach views the trial of an incompetent defendant as essentially a trial *in absentia*, where the accused, though physically present in court, has no opportunity to defend himself. See *Drope v. Missouri*, 420 U.S. 162, 171, 95 S.Ct. 896, 903–04, 43 L.Ed.2d 103 (1975), citing Foote, "A Comment on Pre-Trial Commitment of Criminal Defendants," 108 U.Pa.L.Rev. 832, 834 (1960), and *Thomas v. Cunningham*, 313 F.2d 934, 938 (4th Cir. 1963).

8. As previously noted, sentencing was pronounced on December 2, 1974, at defendant's request. Additional testimony on the issue of competency was heard on December 3, and December 10, 1974, and I then made the statement that further testing could be carried out, including the use of sodium amatol (N.T. 274, Dec. 10, 1974; see also N.T. 82, Nov. 22, 1974), if that was counsel's wish. I also gave the defense an opportunity to present any additional argument or information it desired.

9. Defendant throughout his brief assumes that a competency proceeding is adversary in

■ From defendant's argument that I erred in acting as the "presenter of evidence" and the finder of the fact of competency, it would appear that he seriously misreads both 18 U.S.C. § 4244 and fails to appreciate the proper function of a district judge. That Congress intended the court to play what might be termed an activist role where competency to stand trial is at issue is readily evident from the words of 18 U.S.C. § 4244. Congress provided upon a motion for a *judicial determination* of the mental incompetency of a criminal defendant by either the United States attorney or by the defense,

. . . or upon its own motion, the court shall cause the accused, whether or not previously admitted to bail, to be examined as to his mental condition by at least one qualified psychiatrist, who shall report to the court. For the purpose of the examination the court may order the accused committed for such reasonable period as the court may determine to a suitable hospital or other facility to be designated by the court. If the report of the psychiatrist indicates a state of present insanity or such mental incompetency in the accused, the court shall hold a hearing, upon due notice, at which evidence as to the mental condition of the accused may be submitted, including that of the reporting psychiatrist, and make a finding with respect thereto . . . .

The Court of Appeals for this Circuit had occasion to consider Section 4244 at length in *United States v. Pogany,* supra. In that case the district court implied that it would hold a competency hearing after the accused was examined by a psychiatrist selected by the Government. Defendant underwent such an examination, but upon receipt of the Government's psychiatrist's report—and solely on that basis—the court refused the accused's motion for a competency hearing. In reversing defendant's conviction in the trial which followed, Judge Hunter stated:

Fairness requires that the examining psychiatrist pursuant to a § 4244 motion be an officer of the Court and responsible neither to the defense nor the prosecution. *United States v. Theriault,* 440 F.2d 713 (5th Cir. 1971); *In Re Harmon,* 425 F.2d 916, 918 (1st Cir. 1970). In *United States v. Theriault,* the Court stated:

"Sec. 4244 concerns examination to determine if the defendant is competent to stand trial. The court appoints a psychiatrist who examines the accused and reports to the court.

Rule 28 [Fed.R.Crim.P.] authorizes the court to appoint its own expert witness, who is expected to be neutral and detached. He advises the parties of his findings. . . .

The impartial expert appointed under Rule 28 at the request of defense counsel to inquire into defendant's sanity is not a prosecution witness but the court's witness . . . ." 440 F.2d at 715 [footnote omitted].

465 F.2d at 78. Thus the "marshalling of factual evidence" and appointment of Dr. Eardley, both of which the defendant views in his brief as improper, were precisely the kind of activities appropriate, indeed essential, to a trial court's

---

nature. Clearly such proceedings are nonadversary unless and until a psychiatric report reflects a mental condition calling for a hearing and examination by the court of the competence of the accused. *Caster v. United States,* 319 F.2d 850, 852 (5th Cir. 1963), cert. denied, 376 U.S. 953, 84 S.Ct. 972, 11 L.Ed.2d 973 (1964); *Stone v. United States,* 358 F.2d 503, 506 (9th Cir. 1966). Even

where further inquiry, in the form of a hearing, is called for, it perhaps might best be characterized as investigatory. Nevertheless, assuming, without deciding, that defendant's position is correct, the full panoply of safeguards accorded him, here plainly satisfies even the most stringent procedural demands of an adversary setting.

function where competency of the defendant is at issue.

More fundamentally, the defendant seems to view my calling and questioning of witnesses in the competency proceedings as somehow inimical to the truth-finding process. The Court of Appeals for the District of Columbia Circuit recently addressed this question in *United States v. Liddy*, 166 U.S.App.D. C. 95, 509 F.2d 428 (1974). In response to appellant's claim that certain actions of Judge Sirica at the first of the so-called "Watergate" trials constituted prejudicial error, the court said:

> The precepts of fair trial and judicial objectivity do not require a judge to be inert. The trial judge is properly governed by the interest of justice and truth, and is not compelled to act as if he were merely presiding at a sporting match. He is not a "mere moderator." As Justice Frankfurter put it, "[f]ederal judges are not referees at prize-fights but functionaries of justice." *Johnson v. United States*, 333 U.S. 46, 54, 68 S.Ct. 391, 395, 92 L.Ed. 468 (1948) (dissenting in part). A federal trial judge has inherent authority not only to comment on the evidence adduced by counsel, but also—in appropriate instances—to call or recall and question witnesses. [footnotes omitted]

*Id.* at 105, 509 F.2d at 438. Indeed, the court went on to characterize "Judge Sirica's palpable search for truth" as "not only permissible . . [but] in the highest tradition of his office as a federal judge." *Id.* at 109, 509 F.2d at 442. Under our system of equal justice under law, an inquiry into a defendant's competency to stand trial must be deemed as deserving of a judge's zealous efforts to ascertain the truth as a case potentially involving the leaders of our national government.

■ Defendant next asserts that I erred in ruling on the issue of his competency without first committing the body of expert testimony into the hands of a psychiatrist, psychologist, or a non-interested attorney. This contention not only was untimely made,[10] but flies in the face of both the wording of 18 U.S. C. § 4244 and the case law. The statute plainly speaks in terms of a "judicial determination" of mental competency and to the "finding by the judge." See *United States v. Holmes*, 452 F.2d 249, 267 n. 25 (7th Cir. 1971), cert. denied, 405 U.S. 1016, 92 S.Ct. 1291, 1302, 31 L.Ed.2d 479, 407 U.S. 909, 92 S.Ct. 2433, 32 L.Ed.2d 683, reh. denied, 409 U.S. 1002, 93 S.Ct. 305, 34 L.Ed.2d 264 (1972). And in *United States v. Horowitz*, 360 F.Supp. 772 (E.D.Pa.1973), Judge Huyett held that competency is a factual determination and the judge the finder of fact. At least four Circuits which have considered the question agree. See *United States v. Holmes*, supra; *Hall v. United States*, 410 F.2d 653, 658 (4th Cir.), cert. denied, 396 U. S. 970, 90 S.Ct. 455, 24 L.Ed.2d 436 (1969); *United States v. Huff*, 409 F.2d 1225, 1228 (5th Cir.), cert. denied, 396 U.S. 857, 90 S.Ct. 123, 24 L.Ed.2d 108 (1969); *United States v. Davis*, 365 F. 2d 251, 256 (6th Cir. 1966). Lastly, I find quite repugnant the suggestion that a district court should delegate the solemn duty of evaluating conflicting evidence to one to whom that responsibility has been entrusted neither by the Constitution nor by statute.[11]

■ Turning to the issues of the proper standard of proof in a competency determination and whether that burden was here met, it is firmly established that a prior adjudication of mental incompetency gives rise to a rebuttal presumption of continued incompetency. See, e. g., *Hurt v. United States*, 327 F.

---

10. Defense counsel failed even to suggest prior to the final hearing where testimony concerning defendant's competence was heard, on December 10, 1974, that anyone else should evaluate and weigh the conflicting testimony.

11. Cf. *United States v. Taylor*, 437 F.2d 371, 380–01 (4th Cir. 1971) (Soboleff, J., concurring in part and dissenting in part), citing *Holloway v. United States*, 119 U.S.App.D.C. 396, 343 F.2d 265, 267 (1964).

2d 978, 981 (8th Cir. 1964); *Gunther v. United States,* 94 U.S.App.D.C. 243, 215 F.2d 493, 496 (1954). My order of May 18, 1973, had precisely this effect, and the presumption of defendant's incompetence persisted until my finding of October 16, 1974, that he was then competent.

■ Defendant posits that my finding of a restoration of competency could be premised only upon proof beyond a reasonable doubt.[12] Because of the subtle and often nebulous considerations inherent in ascertaining the "intellectual and emotional capacity of the accused to perform the functions which are essential to the fairness and accuracy of a criminal proceeding," cf. *United States v. Horowitz,* 360 F.Supp. 772, 777 (E.D. Pa.1973), quoting *Pouncey v. United States,* 121 U.S.App.D.C. 264, 349 F.2d 699, 701 (1965), a lesser standard than proof beyond a reasonable doubt, for example, a showing by a preponderance of the evidence, see, e. g., *People v. Bender,* 20 Ill.2d 45, 169 N.E.2d 328, 333 (1960); *Jordan v. State,* 124 Tenn. 81, 135 S.W. 327, 329 (1911), perhaps should apply in determinations of competency.[13] Nevertheless, for the benefit of any court which might at some future date have occasion to review this matter, I shall state for the record that as of October 16, 1974, and at all times thereafter, before, during and after his trial, up to and including December 10, 1974, I concluded the defendant was competent beyond a reasonable doubt to stand trial.

■ In so finding, I accorded considerable weight to the findings and conclusions of the court's witness, Dr. Eardley. Not only did he possess the requisite degree of neutrality and detachment contemplated by Section 4244 and Rule 28, Fed.R.Crim.P., see *United States v. Pogany,* supra at 78; *United States v. Theriault,* 440 F.2d 713, 715 (5th Cir. 1971), and impressive credentials,[14] but most importantly he, of all the psychiatrists and psychologists who interviewed defendant during the course of these proceedings, had spent the most time with him and acquired the greatest familiarity with, and insight into, his condition. That a witness' intimate familiarity with one claiming to be incompetent entitles his testimony to be accorded great weight is beyond question. See *United States ex rel. Phelan v. Brierly,* 312 F.Supp. 350, 354–55 (E.D.Pa.1970), remanded 474 F.2d 1338 (3d Cir.), cert. denied, 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973); cf. *United States v. Freeman,* 357 F.2d 606, 623 n. 53 (2d Cir. 1966). Dr. Eardley's findings were, moreover, concurred in by other experts. For example, at the October 15–16, 1974, competency hearing, Dr. David Taub testified that he believed that the defendant was competent and that the trial would have no egregious impact upon his mental condition. And

---

12. In response to a question from me on the eve of trial, October 16, 1974, defense counsel said, ". . . I have not experienced any difficulty in communicating with my client, in explaining things to him and obtaining information from him over the last month or so. There have been occasions where there were apparent memory lapses but I think they are attributable to the fact that we are talking about some finite events several years ago." (N.T. 119, Oct. 16, 1974). From this remark and the absence of any contention of incompetency on that date, I gathered there was then no serious question in counsel's mind as to Tesfa's competency.

13. This suggestion is predicated upon the notion that a competency determination is fundamentally investigatory rather than adversary in nature, see text page 13, supra. Where the accused raises the question of mental capacity as an affirmative defense to the crime with which he is charged, his sanity, like every other fact, must, of course, be proved as part of the Government's case beyond a reasonable doubt. *Lynch v. Overholser,* 369 U.S. 705, 713, 82 S.Ct. 1063, 1069, 8 L.Ed.2d 211 (1962); *Davis v. United States,* 160 U.S. 469, 484, 16 S.Ct. 353, 356, 40 L. Ed. 499 (1895); *United States v. Currens,* 290 F.2d 751, 761 (3d Cir. 1961).

14. Dr. Eardley received his medical degree from the University of Arkansas, served his internship at the Arkansas Baptist Hospital in Little Rock, and served one year as a staff physician at the Arkansas State Hospi-

at the October 29–30, 1974, proceeding both Miss Briggs and Mr. Levitt opined that the defendant remained competent and that his inappropriate behavior was both conscious and voluntary. At the post-trial hearing, Dr. Eardley's conclusion, though up-dated by a further examination, remained unchanged. By contrast, Dr. Cooke alone testified that he believed Tesfa to be incompetent on October 29. He was joined in this opinion by Dr. Sadoff at the post-trial hearing on December 3, 1974.

Dr. Cooke's testimony, however, was considerably weakened by his admission that he was not present, nor was any professional person present, while Tesfa completed three psychological tests on which Dr. Cooke relied (N.T. 114, 218, Dec. 3, 1974). These tests were merely left with Tesfa, who was then in custody at the Philadelphia Detention Center, on October 8, 1974. So far as the record shows, while Dr. Cooke may have told Tesfa to complete the tests, he did not tell him not to seek help from other inmates or even inquire afterwards if he had done so.

Dr. Cooke picked up two of the tests on October 11, and the third on October 19 (N.T. 187–88, Dec. 10, 1974). A fourth test by Dr. Cooke, the Rorschach, produced a result that was inconsistent with his diagnosis (id. at 201). Another test was administered on October 19, 1974, but none thereafter. Thus, tests which were an "important" part of Dr. Cooke's evaluation (id. at 247) that Tesfa was incompetent may have reflected Tesfa's responses, the responses of other individuals, or a combination of the two. I was astounded by this procedure, particularly when Dr. Cooke stated that in a hospital or clinic someone would have been present to monitor the tests and prevent the exchange of information (id. at 253, 267–68).

Dr. Cooke's reasoning process in reaching a preliminary conclusion of incompetency also bears on the weight to be accorded his testimony. Dr. Cooke said he first suggested to defense counsel that Tesfa was incompetent because he, Tesfa, "rejected consistently [the notion that] he was insane or mentally ill," (id. at 255) and thus could not assist in the preparation of such a defense (id. at 232–33). However, Dr. Cooke himself was not prepared to state that Tesfa had ever lacked mental responsibility (N.T. 85, Dec. 3, 1974; N.T. 212–13, Dec. 10, 1974). In short, here was a psychologist[15] who said that this defendant was not competent because he refused to go along with a proposed defense, a defense which the psychologist did not even contend was valid.

■ Dr. Sadoff's reliance upon the results of Dr. Cooke's tests[16]—in addition to the disparity in his diagnosis of defendant's condition during and after trial—tended in my view to make his conclusions both tentative and suspect. It is well-settled that although the testi-

---

tal in Little Rock. Two of the three years of his psychiatric residency were at Little Rock State Hospital and the remaining year was spent at the Menninger Foundation in Topeka, Kansas. Thereafter he served at a state hospital followed by two years private practice.

From 1968 through April, 1972, Dr. Eardley was employed by the state of Arkansas, ultimately serving as medical director for the state penal system. He left that post to become a medical officer for the Federal Bureau of Prisons. (N.T. 6–7, Feb. 1, 1975). As previously recounted in the text, in July, 1974, Dr. Eardley assumed the position of Regional Administrator for the North Central Region of the Bureau of Prisons. Additionally, he is a member of the usual local, state, and national psychiatric associations.

It is worthy of special mention that at the October 15, 1974, competency hearing, defense counsel stipulated that Dr. Eardley was a qualified psychiatrist. (N.T. 7, Oct. 15, 1974).

15. A psychologist's lack of a general medical background also may affect the weight given to his testimony in a competency hearing. See *Blunt v. United States*, 128 U.S.App.D.C. 375, 389 F.2d 545, 547 n. 11 (1967).

16. N.T. 162–64, Dec. 3, 1974.

mony of medical experts on the issue of a defendant's competency, albeit generally advisory, cannot arbitrarily be ignored, *Mason v. United States,* 402 F.2d 732, 737 (8th Cir. 1968), cert. denied 394 U.S. 950, 89 S.Ct. 1288, 22 L.Ed.2d 484 (1969); *Mims v. United States,* 375 F.2d 135, 143 (5th Cir. 1967), it is but one factor to be considered and rises no higher than the reasons on which it is based, *Feguer v. United States,* 302 F.2d 214, 236 (8th Cir.), cert. denied, 371 U.S. 872, 83 S.Ct. 123, 9 L.Ed.2d 110 (1962); *Hodges v. United States,* 408 F.2d 543, 555 (8th Cir. 1969); *United States v. Horowitz,* 360 F.Supp. 772, 777 (E.D.Pa.1973).

In essence, defense counsel's contention that his client was incompetent is rooted in Tesfa's refusal or inability to cooperate in asserting the defense of insanity. Adopting Dr. Cooke's theory, counsel argues that since a man in perilous circumstances should cooperate with his attorney, the only explanation for Tesfa's failure to do so must be that he was incompetent. I am unpersuaded. I am no more persuaded than I would have been had Tesfa rejected an alibi defense and refused to furnish the names of friends who would state that he was not on the airplane, but was with them.

I do not know why Tesfa rejected the proposed insanity defense. (See N.T. 232–33, 255, Dec. 10, 1974). Perhaps I am being naive, but it may be that he was simply too honest, and was thoroughly ashamed of what he had done.[17] A second possibility involves his background and heritage. There was testimony from members of Tesfa's family that in Ethiopia a great deal is expected of the eldest son. Failure on his part would bring disgrace to the entire family. This evidence was elicited to show that after Tesfa failed out of Howard University his feeling of rejection and disgrace brought about the insanity which was the central theme of the defense. Thus, it is entirely possible that Tesfa's failure to cooperate with his attorney was a face-saving device to benefit his family. Tesfa might have felt that it would be less painful for his family to believe that he had become mentally ill in the United States and was a victim of injustice, than to admit that he had become a criminal.

Finally, it may be that Tesfa is very shrewd,[18] was convinced that the best way to avoid punishment was to avoid trial, and the best way to avoid trial was to convince his lawyer he was incompetent. In brief, he may have reasoned that his chances of deportation were better as an accused who is incompetent than as a convicted air pirate.

I have no doubt that Tesfa was uncooperative with his attorney, but I concluded that this was a voluntary, conscious choice on his part. Not everyone who rejects advice is incompetent. Many men, in the face of overwhelming evidence and medical advice, smoke too much, drink too much, eat too much, and live sedentary lives. This may make them bad insurance risks, but it hardly establishes their incompetence. Every lawyer has had clients who disregard advice and plunge into legal quagmires. They may be foolish, but they are not incompetent. So it may have been with Tesfa. I accepted the fact that he did not cooperate with counsel, but I emphatically rejected the proposition that this established he was unfit to stand trial.

---

17. Dr. Eardley said Tesfa "was embarrassed, he was concerned about [the trial], his family was here at this particular time, the publicity involved." He dwelled upon his embarrassment, his own failure at this age (N.T. 722–23, 724, 735, Dec. 10, 1974). He was embarrassed and concerned for his family. (id. at 732).

18. Tesfa has an IQ of 122 and is considered of superior intelligence (N.T. 191, 119, Dec. 10, 1974). He told Dr. Eardley he wanted the trial stopped (id. at 722–23, 725, 730, 737).

## III. VOIR DIRE EXAMINATION OF VENIREMEN

Defendant contends that I abused my discretion during the jury selection process by (1) refusing his motion to allow counsel, rather than the court, to conduct the *voir dire;* (2) refusing to ask prospective jurors all the questions submitted by his counsel; (3) propounding questions insufficiently geared to ascertain bias or prejudice, and thus preventing him from intelligently exercising his preemptory challenges; and (4) refusing to strike one venireman for cause on the basis of his responses to my questions.

■ "The purpose of *voir dire* examination is to safeguard the right to jury trial which 'guarantees to the criminal accused a fair trial by a panel of impartial, "indifferent" jurors.'" *United States v. Liddy,* supra, 166 U.S.App.D.C. at 101, 509 F.2d at 434; see *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). The impartiality requirement demands that *voir dire* act as a filter capable of screening out those prospective jurors unable to lay aside any opinion as to guilt or innocence and render a verdict based on the evidence. Id. at 723, 81 S.Ct. 1643; *United States v. Liddy,* supra, 166 U.S. App.D.C. at 101, 509 F.2d at 434. Under Rule 24(a), Fed.R.Crim.P., a trial judge has broad discretion to mold the manner and mode of *voir dire* to meet the demands of the case at bar, and can be reversed only for an abuse of discretion which is substantially prejudicial to the accused. Id. at 101–02, 509 F.2d at 434–35; *United States v. Bamberger,* 456 F.2d 1119, 1129 (3rd Cir.), cert. denied sub nom. *Elam v. United States,* 406 U.S. 969, 92 S.Ct. 2424, 32 L.Ed.2d 668 (1972), and *Crapps v. United States,*

406 U.S. 969, 92 S.Ct. 2424, 32 L.Ed.2d 668, and 413 U.S. 919, 93 S.Ct. 3067, 37 L.Ed.2d 1046 (1973).

■ The short answer to defendant's first objection is that absent an abuse of discretion, refusal to allow counsel to conduct *voir dire* examination is not error. *United States v. Addonizio,* 451 F.2d 49, 65–66 (3d Cir. 1971), cert. denied, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972), reh. denied, 405 U.S. 1048, 92 S.Ct. 1309, 31 L.Ed.2d 591. Examination of prospective jurors by the trial judge conforms to Rule 24(a), Fed.R.Crim.P.,[19] and is the standard practice in most federal district courts, see *The Jury System in the Federal Courts, Report of the Judicial Conference Committee on the Operation of the Jury System,* 26 F.R.D. 409, 466 (1960); *United States v. Addonizio,* supra, 451 F.2d at 65; see also Campbell, *Delays in Criminal Cases,* 55 F.R.D. 229, 247 (1972).

■ With respect to defendant's second and third objections, concerning the questions propounded individually to each venireman, statement of a few additional facts is appropriate. On the morning that jury selection was to commence, defense counsel submitted a pleading entitled "Individual Voir Dire." This document contained over 60 questions, in addition to the forty which I already intended to ask and copies of which I previously had furnished to counsel for both sides. Many of the proposed additional questions were redundant or irrelevant; few were helpful. Counsel and I spent all morning and part of the afternoon in my chambers discussing these questions and attempting to achieve some compromise. At length I settled upon some approxi-

19. Rule 24(a) provides:
The court may permit the defendant or his attorney and the attorney for the government to conduct the examination of prospective jurors or may itself conduct the examination. In the latter event the court shall permit the defendant or his attorney and the attorney for the government to supplement the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors such additional questions by the parties or their attorneys as it deems proper.

mately fifty-five questions to be propounded to each juror individually. The jury selection process extended over the period of one week. The prospective jurors were segregated from the remainder of the veniremen, and each was examined individually and out of the hearing of the others, see *United States v. Addonizio,* supra, 451 F.2d at 67; *A.B. A. Standards Relating to Fair Trial and Free Press* § 3.4(a) (Approved Draft, March 1968). Moreover, whenever a venireman responded to a question in a manner which I felt called for some elaboration I asked him such additional questions as were necessary to clarify his initial response.

In *Ham v. South Carolina,* 409 U.S. 524, 527, 93 S.Ct. 848, 850, 35 L.Ed.2d 46 (1973), the Supreme Court held that although a trial judge is constitutionally compelled, where requested, to inquire into the possibility of racial prejudice on voir dire,[20] he is not required to put the question in any particular form, or to ask any particular number of questions on the subject simply because he is requested to do so by the defendant. See also *Featherston v. United States,* 491 F.2d 96 (5th Cir.), cert. denied, 417 U.S. 971, 94 S.Ct. 3176, 41 L.Ed.2d 1142 (1974); *Ross v. Ristaino,* 508 F.2d 754, 757 (1st Cir. 1974); *United States v. Addonizio,* supra, 451 F.2d at 66. Appended to this opinion are the interrogatories ultimately put to each prospective juror, (Appendix A) and those proposed by the defense (Appendix B). Even a cursory comparison of the two demonstrates that the questions I propounded provided a comprehensive and exhaustive inquiry into each prospective juror's possible bias or prejudice with respect to air travel (# 12) and the airline industry (# 14–16).; psychiatry (# 34, 35) and the insanity defense (# 36–38);

foreign students (# 43, 44) and students who advocate revolution (# 46); and the defendant's race (# 45) and nation of his origin (# 47). Such a thorough interrogation plainly did not constitute an abuse of discretion.

Defendant's final contention with respect to jury selection stems from my refusal to dismiss for cause a venireman who admitted having certain negative opinions and prejudice concerning psychiatry and the insanity defense, foreigners, and persons favoring revolution. In each instance I thereupon asked whether he nevertheless could put aside his feelings and decide the case solely on the basis of the evidence produced in court and my instructions, and in each instance, he responded affirmatively. I therefore refused defendant's motion to challenge for cause, although his counsel later exercised a preemptory challenge to excuse that venireman.

The test that I applied was that laid down in *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751 (1961), wherein the Court stated:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. *Spies v. People of State of Illinois,* 123 U.S. 131, 8 S.Ct. 22, 31 L.Ed. 80; *Holt v. United States,* 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021; *Reynolds v. United States* [98 U.S. 145, 155, 25 L. Ed. 244].

---

20. See also *Aldridge v. United States,* 283 U. S. 308, 51 S.Ct. 470, 75 L.Ed. 1074 (1931); *United States v. Bamberger,* 456 F.2d 1119, 1129 (3d Cir.) cert. denied sub nom. *Elam v. United States,* 406 U.S. 969, 92 S.Ct. 2424, 32 L.Ed.2d 668 (1972), and *Crapps v. United States,* 406 U.S. 969, 92 S.Ct. 2424, 32 L. Ed.2d 668, and 413 U.S. 919, 93 S.Ct. 3067, 37 L.Ed.2d 1046 (1973).

See also *United States v. McNally,* 485 F.2d 398, 403 (8th Cir. 1973), cert. denied, 415 U.S. 978, 94 S.Ct. 1566, 39 L. Ed.2d 874 (1974); *Johnson v. United States,* 484 F.2d 309, 310 (8th Cir.), cert. denied, 414 U.S. 1039, 94 S.Ct. 539, 38 L.Ed.2d 329 (1973). Thus, although defendant perhaps wisely elected to exercise his preemptory challenge, an insufficient basis existed for me to grant his motion to strike for cause.

## IV. QUALIFICATION OF THE GOVERNMENT PSYCHOLOGIST

Defendant's final argument is that I erred in accepting the testimony of the Government psychologist, Albert Levitt, on the issue of defendant's sanity. Specifically, defendant contends that not only did Mr. Levitt fail to possess the special qualifications essential to an expert witness, but that his opinion was based on conjecture and guesswork rather than valid and accepted testing procedures.

It is of more than passing interest that at the May, 1973, competency proceeding, defense counsel was willing to stipulate that Mr. Levitt was eminently qualified. Moreover, in *United States v. Green,* supra, 373 F.Supp. at 157–58, I concluded that Mr. Levitt was qualified to testify as to the competency of Tesfa's co-defendant, and in its unpublished per curiam affirmance, the Court of Appeals held that my conclusion was not erroneous.

 The initial question of whether an expert witness possesses sufficient capacity and qualifications to testify is, of course, within the discretion of the trial judge. *United States v. Trice,* 476 F.2d 89, 91 (9th Cir., cert. denied sub nom. *Clayton v. United States,* 414 U.S. 843, 94 S.Ct. 103, 38 L. Ed.2d 81 (1973). Clearly the testimony of psychologists, as well as psychiatrists, is admissible on the question of insanity. *United States v. Brawner,* 153 U.S.App.

D.C. 1, 471 F.2d 969, 994 (en banc, 1972); *Jenkins v. United States,* 113 U. S.App.D.C. 300, 307 F.2d 637, 643 (en banc, 1962). As Judge Bazelon pointed out in *Jenkins:*

> The critical factor in respect to admissibility is the actual experience of the witness and the probable probative value of his opinion . . .
>
> \* \* \* \* \* \*
>
> The determination of a psychologist's competence to render an expert opinion based on his findings as to the presence or absence of mental disease or defect must depend upon the nature and extent of his knowledge. It does not depend upon his claim to the title "psychologist."

Id. at 309, 307 F.2d at 646. And Mr. Chief Justice (then Circuit Judge) Burger, concurring in the same case, emphasized that "many factors other than academic degrees go to the admissibility and weight of the [psychologist's] expert testimony." Id. at 313, 307 F.2d at 650.

 Mr. Levitt's credentials eminently qualified him as an expert witness. He holds a master's degree in group dynamics from Temple University, and has done additional clinical psychological work beyond the master's level. He is, moreover, licensed by the Commonwealth of Pennsylvania. From September, 1962, through August, 1963, he served an internship at the Bordentown, New Jersey, Reformatory, and from 1963 to 1965 he was a clinical psychologist at that institution. His duties there included the evaluation and treatment of inmates. Between 1965 and 1967 he worked as a consultant to the Trenton, New Jersey, State Prison, where he did psychological evaluations of prisoners ready to be paroled.

Mr. Levitt left Trenton to become chief psychologist for the Parole Board

of the Commonwealth of Pennsylvania, Eastern District. During the two years he served in that position he did psychological evaluations for the purpose of determining whether inmates should be released on parole, maintained on parole, or returned to prison. In addition, he developed and ran a group therapy program for prison-addicts. He left the Parole Board post to become Chief Psychologist for the Philadelphia Court of Common Pleas, the position he now holds. His duties there include the evaluation and preparation of reports for the court of persons accused and convicted of crimes. The court relies upon these reports in determining such matters as the competency of defendants to stand trial and the best post-trial disposition of persons convicted. In addition, Mr. Levitt has done work for courts in Chester and Delaware Counties, Pennsylvania, and Burlington County, New Jersey, and lectures to psychiatric residents at Temple University and students in the criminal justice program at Villanova University. He has also published a number of professional articles.

 In response to the second prong of defendant's attack, any question concerning the weight to be accorded Mr. Levitt's testimony was, of course, exclusively within the province of the jury. *United States v. Hamling*, 481 F.2d 307, 318 (9th Cir. 1973), affirmed, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590, reh. denied, 419 U.S. 885, 95 S.Ct. 157, 42 L. Ed.2d 129 (1974); *Gendelman v. United States*, 191 F.2d 993, 997 (9th Cir. 1951), cert. denied, 342 U.S. 909, 72 S. Ct. 302, 96 L.Ed. 680 (1952).

## V. CONCLUSION

After a careful consideration of the briefs and an exhaustive review of the notes of testimony, I find that Tesfa was properly determined to be competent at each and every stage of his trial, that the *voir dire* more than satisfied the correct standards, and that Mr. Levitt was an eminently qualified expert witness. Accordingly, I conclude that defendant's post-trial motions were properly denied.

## APPENDIX A

### VOIR DIRE OF THE COURT

#### VOIR DIRE
#### (GROUP)

1. Are you personally acquainted with the defendant, related to him by blood or marriage, or do you or any member of your immediate family have any connection of any kind with the defendant?

2. (Request counsel to rise and introduce them)

 Do you know any of the attorneys in this case? Are you related to any by blood or marriage? Have you had any professional, social, or other relationship with any of them? Has any acted as your attorney or the attorney for a member of your immediate family or a close friend to your knowledge?

3. Have you ever served as a juror in a criminal or civil case, or as a member of a Grand Jury, either in the Federal or State courts?

4. Have you or has any member of your family ever been the victim of a crime, or participated in a criminal case as a complainant, a witness for the government, or in some other capacity on behalf of the prosecution?

5. Have you or has any member of your family ever been charged with a criminal offense, or ever participated in a criminal case as a defendant, witness for the defense, or in any other capacity for the defense?

6. Have you or has any member of your immediate family or any of

your close personal friends ever served as a law enforcement officer? Or for any private security agency such as Brinks, Pinkertons, etc.?

7. Are you or have you ever been an official or an employee of the United States Government?

8. Is or has any member of your immediate family ever been an official or an employee of the United States Government?

9. Do you or does any member of your immediate family, or any close personal friend, have any dealings with the United States Government, or any of its agencies, or with any of the defendants from which you or they might profit?

10. Do you now have, or have you ever had, or do you anticipate having any case or dispute with, or claim against, the United States Government or any of the defendants?

11. Would any of you be more apt to believe a witness just because he or she testifies on behalf of the Government than if he or she testified on behalf of the defense? Would any of you be more apt to believe a witness just because he or she testifies on behalf of the defense than if he or she testified on behalf of the Government?

12. Do any of you have occasion to travel by airplane, and if so, how often?

13. The charges in this case grow out of an incident which allegedly took place in July, 1972. It is charged by the Government that two men seized control of a National Airlines airplane which was on its way to New York. The plane returned to Philadelphia where it landed at approximately 9:00 P.M. It remained on the ground until early the following morning. A large sum of money was then delivered to the two men. The passengers were then released and certain members of the crew and the two men then boarded another plane and flew to Texas. Later, two men surrendered to the FBI. It is alleged that one of the two men was the defendant, Lulseged Tesfa, who is a native of Ethiopia, and a former student at Howard University, Washington, D. C. The other man allegedly was Michael Green, who lived and worked in Washington D. C.

As a result of this alleged incident, Mr. Tesfa has been charged with air piracy.

Do any of you know Mr. Tesfa or Mr. Green or any member of the family or any close friend of either?

14. Do you have any friends or relatives who are in any way involved in the aviation industry— such as being a pilot, stewardess, engineer, secretary, ground support person, or airport security guard?

15. Do you own any stock or security in any airline company?

16. Do you know anyone who has been a passenger aboard a plane which was hijacked?

17. At the conclusion of the trial, I will give you certain instructions on the law. Among other things, I will tell you that it will be your duty to make all findings on the facts, but that you are to accept my instructions as to the law, laying aside whatever views you may have as to what the law is or should be. I will also tell you that the case is to be tried on the basis of the evidence and the law, without bias, prejudice, or sympathy. Do you feel you could follow the instructions and ren-

der a verdict that would be fair and just?

## VOIR DIRE (INDIVIDUAL)

18. Has anyone talked to you about this case or about any questions that I might ask you in connection with the jury selection process?

19. Interrogate as to affirmative answers received during collective voir dire.

20. Have you or has any member of your family ever been charged with a criminal offense, or ever participated in a criminal case as a defendant, witness for the defense, or in any other capacity for the defense?

21. At the time of the incident with which we are concerned, certain articles appeared in the newspapers and there were news broadcasts concerning it over both radio and television. It may have also been discussed by people who live in this area—people you may know.

Do you remember reading or hearing anything about the mental condition of either man?

22. Did you read or hear anything about the possibility that either of the men in question might not be criminally responsible for that which he did on this occasion by reason of his mental condition?

What did you read or hear?

23. Do you remember reading anything about the treatment of the passengers from the time the incident started until they were released?

What do you remember?

24. Do you remember reading anything about the treatment of the members of the crew?

What do you remember?

25. Do you remember reading anything about any events which may have taken place while the plane was on the ground at Philadelphia?

What do you remember?

26. Do you remember reading or hearing anything which purported to tell about the background of either of the two men involved?

What do you remember?

27. Do you remember reading or hearing anything that was said about these men since their arrest?

What do you remember?

28. Do you remember reading or hearing anything which was allegedly said by the passengers or the members of the crew after they were released?

What do you remember?

29. Do you remember reading or hearing anything which was allegedly said by any government official concerning this event?

What do you remember?

30. Do you know anything at all about this incident as a result of anything you may have read, heard on radio or television or by reason of that which you may have been told? Did you hear it discussed in any way or did you read about it in any way?

What do you remember?

31. Do you recall where you were during mid-July of last year? Were you in this area—or away on vacation—visiting relatives, or the like?

32. Do you believe skyjacking is a serious crime—and if so, why?

33. Have you read anything about any incident of aircraft piracy—or about hijackers—which would in any way affect your ability to render a fair and impartial verdict in this case?

34. Have you or anyone that you know been treated by a psychiatrist or consulted with a psychiatrist for any reason?

35. As a result of that experience, or for any other reason, do you have any opinions about psychiatrists?

36. I realize that you may not have studied law—or may not even have thought about the matter—but do you have any opinion as to whether or not insanity should constitute a defense to criminal charges?

37. Is your opinion so fixed that you could not set it aside if you found it to be at variance with the instructions on the law that I will give at the close of the case?

38. In this case it is expected that the defense will offer testimony that the defendant lacked the mental capacity to commit the crime in question. It is also expected that the prosecution will offer testimony that he had the mental capacity to commit the crime with which he is being charged.

 (a) If you are chosen as a juror would you be able to separate the question of whether the defendant did the acts which comprise a skyjacking from the question of whether he was legally sane at the time those acts were committed?

 (b) In light of the testimony that can be anticipated in this case, do you know of any reason that would affect your ability to render a just and impartial verdict based upon the law and the evidence?

39. Do you understand that just because a serious crime has been committed, an investigation conducted by the FBI, the defendant has been arrested, indicted, and brought to trial with a judge, jury, witnesses, United States Marshalls, etc., that it does not necessarily mean that he is guilty of the crime charged?

40. Do you have any opinion or feeling about our criminal justice system that would affect your ability to render a fair and impartial verdict in this case?

41. Have you or any member of your family ever lived as an adult in a foreign country? If so, who was it and in which country?

42. When did this occur and what were the circumstances?

43. Have you ever had any contact with foreign students living in this country?

44. Do you have any opinions or feelings about foreigners or foreign students that would in any way affect your ability to render a fair and impartial verdict in this case?

45. Do you have any opinions or feelings about black people that would in any way affect your ability to render a fair and impartial verdict in this case?

46. Do you have any opinion and feeling about students who advocate revolution that would in any way affect your ability to render a fair and impartial verdict in this case?

47. Do you have any opinions, feelings, or knowledge about current events in Ethiopia?

48. Under our system of justice, every defendant who is accused of a crime is presumed to be innocent and it is the burden of the government to prove him guilty beyond a reasonable doubt. The presumption of innocence applies to a defendant who is charged with air piracy. If you are chosen as a juror, I will instruct fully on this aspect of the law. Do

you know of anything that would affect your ability to follow such an instruction under the circumstances of this case?

49. Under our system of justice, a defendant who is accused of a crime need not testify and a jury is not permitted to draw any adverse inference from the fact that he exercises this constitutional right. If you are chosen as a juror I will instruct you on this aspect of the law. Do you know of anything that would affect your ability to follow such an instruction under the circumstances of this case?

50. Do you know of any reason why you may be partial for or prejudiced against the Government?

51. Do you know of any reason why you may be partial for or prejudiced against the defendant?

52. If you are selected to serve as a juror in this case do you feel you will be able to put aside any prejudice you may have, or any predetermined feelings that may be yours, and examine and weigh the evidence fairly and impartially?

53. Can you think of any other matter which you should call to the Court's attention which might have some bearing on your qualifications as a juror? Which may prevent your rendering a fair and impartial verdict based solely upon the evidence and my instructions as to the law?

## APPENDIX B

### INDIVIDUAL VOIR DIRE PROPOSED BY THE DEFENDANT

1. When you first heard of the skyjacking in this case what were your first thoughts and feelings?

2. What do you now think about that initial reaction?

3. Have you ever thought about what punishment or treatment should be imposed upon people who skyjacked or attempted to skyjack airplanes?

4. What do you think now?

5. Do you think that you will be able to put these beliefs and feelings aside and consider the evidence presented to you fairly and impartially?

6. Do you think you can put those beliefs and feelings aside and decide this case solely upon the evidence presented in court and the law as the judge instructs you?

7. If you are selected to serve as a juror in this case will you promise upon your solemn oath as a juror to put aside your own prejudices and predetermined feelings and to examine and consider the evidence fairly and impartially?

8. If you are selected to serve as a juror in this case, will you promise upon your solemn oath as a juror to decide the case solely upon the evidence presented to you and the law as the judge instructs you?

9. Or for any other reason?

10. What is your opinion of psychiatrists and psychiatry?

11. If you are selected to serve as a juror in this case do you honestly believe that you could put aside any prejudices or pre-formed feelings you have about psychiatrists or psychiatry and fairly and impartially evaluate evidence given by psychiatrists?

12. If you are selected to serve as a juror in this case will you promise on your solemn oath as a juror that you will put aside any prejudices or pre-formed feelings you may have about psychiatrists or psychiatry and evaluate any evidence that may be presented by psychiatrists or psychologists fairly, impartially and objectively?

13. Have you ever heard of a case in which a person accused of committing a serious crime pleaded that he should not be convicted because he was legally insane at the time the crime was committed?

14. If so, (1) What did you think of it at that time?

(b) What do you think of it now?

15. Did you ever discuss or were you ever present during a discussion of the defense of legal insanity or the fact that someone did or might claim he was legally insane at the time he committed certain illegal acts?

(a) If so, what was the position you took?

What was your real belief?

(b) What was the opinion expressed by most of the others who discussed it?

(c) What do you think most people believe about it?

(d) What do you believe?

16. Do you believe that you, yourself, if you are chosen to serve on the jury in this case, would be able to separate and consider the question of whether the defendant did the acts which comprise an air piracy (skyjacking) separately from the question of whether he was legally sane at the time those acts were committed?

17. If you are chosen to serve as a juror in this case, will you promise upon your solemn oath as a juror to put aside any prejudices or pre-formed beliefs or feelings about legal insanity and apply the evidence as you hear and see it, fairly and impartially to the law as the judge instructs you?

18. Have you ever heard of "proof beyond a reasonable doubt?" If so, in what context and what does it mean to you.

19. Under our system of justice, it is the prosecution's burden to prove every element of the crime charged—including the defendant's mental capacity at the time the crime was committed—beyond a reasonable doubt. If you are chosen as a juror, I will instruct you fully on this aspect of the law. Is there any reason why you could not follow such an instruction under the circumstances of this case?

20. If you are chosen to serve as a juror in this case and after you have heard all of the evidence in this case, and after I have instructed you fully about the law you must apply to that evidence—particularly the law with respect to the fact the prosecution has the burden of proving every element of the crime charged beyond a reasonable doubt—if you conclude that you personally believe the defendant to be guilty but do not believe that the prosecution has proved every element of the crime charged beyond a reasonable doubt would you feel badly or have difficulty finding the defendant "not guilty"?

(a) Why?

(b) If, under the circumstances of the proceeding questions, you would feel badly or have difficulty finding the defendant "not guilty" do you think that, if you are chosen to serve as a juror in this case, do you honestly believe that you would be able to put aside any such personal feelings and decide the case solely upon the evidence and in accordance with the laws as the judge instructs you?

(c) If you are chosen to serve as a juror in this case, and if after hearing all of the evidence and the judge's instructions on the law you must follow, you personally believe the defendant is guilty, but you do not believe that the evidence proves every element of the crime charged beyond a reasonable doubt will you promise, upon your solemn oath as a juror to decide the case not upon personal belief but solely upon your fair and impartial evaluation of the evidence and the law as the judge instructs you?

21. Do you feel that if a serious crime has been committed, an investigation was conducted by the FBI, the defendant was arrested, charged with the crime, and brought to trial with a judge, jury, witnesses, United States Marshals, etc., that the defendant probably is guilty?

22. What is your opinion, if any, of the judicial system of the criminal justice system in this country?

23. If you are chosen to serve as a juror in this case, do you believe that those opinions will affect your ability to evaluate the evidence fairly and impartially and to apply the law as the judge instructs you?

24. If you are chosen to serve as a juror in this case, will you promise, upon your solemn oath as a juror, to put aside those opinions and to evaluate the evidence fairly and impartially and apply it to the law as the judge instructs you?

25. Were you and/or your spouse in the military service?

26. What branch, for what period of time?

27. What was your highest rank and what were you duties?

28. Were you ever a member of a court martial?

29. Did you ever serve with the military police, shore patrol, etc?

30. You have heard of, seen or read, have you not, either Perry Mason or some other fictional character who specializes in defending persons accused of crimes? In those cases, the defendant, or his lawyer, is able at the last minute, of course, to show that someone other than the accused really committed the crime in question.

31. Would you expect Mr. Tesfa to do that in this case?

32. If you are selected to serve as a juror in this case, and the court instructs you that the defendant does not have to do anything except defend himself, and it is the prosecution which bears the burden of proving every element of the crime charged, would you be able to follow that instruction?

33. Are you aware that under our law, it is the fundamental precept that the defendant need not take the witness stand and testify in his own behalf?

34. If I instruct you that the defendant has a fundamental constitutional right to not testify and that you may not(!) draw any inference adverse to him from his failure to testify, would you have any difficulty following that instruction?

35. If you are chosen to serve as a juror in this case, will you promise upon your solemn oath not to draw any inference?

36. Are you and/or your spouse a member of a union, if so, what union?

37. Have you or your spouse or children ever lived as an adult in a foreign country?

38. Who was it who lived in the foreign country?

39. What was/were the country/countries?

40. When?

41. What were the circumstances?

42. Did that person have a lot of contact with the foreign culture? If so, how and in what context?

43. As a result of that experience do you have any beliefs which you believe might interfere with your rendering a fair and impartial verdict in this case?

44. Have you ever had any contact with foreign students studying in this country?

45. When and what was that experience?

46. What opinions or feelings did you have about such students?

47. If you are chosen to serve as a juror in this case, do you honestly believe that you would be able to put aside those beliefs, to evaluate the evidence fairly and objectively and apply the facts as you find them to the law as the judge instructs you?

48. If you are chosen to serve as a juror in this case, will you promise upon your solemn oath as a juror that you will evaluate the evidence fairly and objectively, and apply the facts to the law as the judge instructs you and not hold it against the defendant that he came to this country as a foreign student?

49. Have you ever had any social contacts with any black people from Africa?

50. When?

51. Under what circumstances?

52. What is your general attitude toward people from Africa?

53. Do you think that black people from Africa are different from white Americans?

54. If so, in what ways?

55. If you are selected to serve as a juror in this case, do you honestly believe that you will be able to put aside those beliefs and evaluate the evidence fairly and objectively and apply the evidence to the law as the judge instructs you?

56. If you are chosen to serve as a juror in this case, will you promise upon your solemn oath as a juror that you will put aside those beliefs and evaluate the evidence fairly and objectively?

57. What do you think of students today who go around saying that there ought to be a revolution in their country?

58. If you are chosen to serve on the jury in this case, do you honestly believe that you will be able to put aside those beliefs and evaluate the evidence fairly and objectively and apply the law as the judge instructs you?

59. If you are chosen to serve as a juror in this case, will you promise upon your solemn oath as a juror that you will put aside those pre-formed beliefs, evaluate the evidence fairly and objectively and apply the law as the judge instructs you?

60. Have you ever heard of Haille Sellasie, the former Emperor of Ethiopia?

61. What do you think of him?

62. Have you heard or read of the take-over of the Ethiopian Government by members of the military?

63. What did you think of that?

64. If you are chosen to serve as a juror in this case and if after fairly and objectively evaluating the evidence and applying the law as the judge instructs you, you reach a conclusion as to the guilt or innocence of the defendant, will you be able to stick to that opinion as long as you believe it to be correct, even though other jurors try to get you to change your vote? In other words, will you be able to "stick to your guns" as long as you believe your conclusion to be correct?

65. If you are chosen to serve as a juror in this case, will you promise upon your solemn oath as a juror that, although you will deliberate and discuss and evaluate the case with the other jurors with an open mind, you will stick to your opinion as long as you believe it to be correct?